SALAKY

v.

THE ATLAS BARGE NO. 3 et al.

THE CATHERINE O'BOYLE et al.

No. 68, Docket 22812.

United States Court of Appeals
Second Circuit.

Argued Nov. 2, 1953.

Decided Nov. 20, 1953.

George A. Berkowitz, New York City (Paley & Berkowitz, New York City, on the brief), for respondent-appellant Atlas Tank Processing Corp.

Gerald J. McKernan, New York City (Macklin, Speer, Hanan & McKernan and James N. Allan, New York City, on the brief), for respondents-appellants Jerome E. and Loretta O'Boyle.

Max Taylor and Maurice A. Krisel, New York City (Krisel, Beck & Taylor, New York City, on the brief), for libelant-appellee.

Before CHASE, Chief Judge, CLARK, Circuit Judge, and BRENNAN, District Judge.

CLARK, Circuit Judge.

Libelant is the assignee of claims of some 44 owners of small craft under an assignment executed in the State of New Jersey. He instituted this action alleging damage to these various craft moored in and about the Yacht Basin at Perth Amboy, N. J., caused by oil sludge and foreign matter discharged from the barges "Atlas Barge No. 3" and "Catherine O'Boyle" into the water of Arthur Kill and Raritan Bay in the vicinity of Perth Amboy in April, 1946. The court below found for libelant by an interlocutory decree referring the issue of damages to a commissioner for computation, and respondents appeal.

The evidence discloses that at 8 o'clock in the morning in question a representative of the U. S. Coast Guard observed oil on the waters of the Yacht Basin. Later that day, some time after 1:00 p. m., together with a U. S. Customs inspector he boarded the "Catherine O'Boyle," which was docked about one and one-half miles north of the Yacht Basin on the Staten Island side of Arthur Kill. She was found with a pump still hot from recent use, its suction line leading down into the forepeak and its discharge line leading over the side.

There was oil on the water all around her.

There was, however, undisputed and unimpeached testimony to the effect that the O'Boyle was empty; that she had carried no oil, but tar which is solid; that to liquefy tar for unloading requires certain steam equipment, not found on board, but attached up, when needed, from another vessel or shore installation; that her cargo tanks ran clear to her bottom, leaving no standard stem to stern bilge; that the forepeak was thus an isolated storage compartment whence the crew had, on the morning in question, pumped not more than thirty gallons of water. We can find no adequate reason for rejecting this testimony. Further, as we have just indicated, there is no actual evidence that the O'Boyle was responsible for any of the oil found in the Arthur Kill.

The "Atlas Barge No. 3" was, at the time, tied to a dock on the New Jersey side a mile and a half further up the Kill and some three miles from the Yacht Basin. For several days she had been engaged in cleaning the tanks of three vessels, and on the day in question was pumping out the bilges of the S.S. Lahaina Victory. The ship was first washed down with diesel fuel, then with water, and the resulting sludge was pumped out into the tanks of the Atlas barge. There was ample evidence that some time after 1:30 p. m. when the Customs and Coast Guard representatives arrived, the Atlas barge was overloaded and sludge was spilling over from her tanks into the water.

There is, however, no evidence connecting this discharge with the damage at the Yacht Basin. The Customs Inspector traced the Atlas oil slick a mile or more south of the Atlas, extending toward the basin; but as late as 4 or 5 o'clock that afternoon it was in the same spot and though he observed the Yacht Basin in both morning and late afternoon, he at no time observed any oil therein. The Coast Guardsman, as noted, testified to the earlier presence of oil in the basin, to wit, at 8:00 a. m. He also saw oil around the Atlas barge, but it was thicker in appearance and he did not describe the condition of the water between the two points. Nor is there any evidence that the Atlas overflow commenced early enough to account for oil in the basin at 8 o'clock in the morning.

The area is one in which water pollution is a frequent problem. There are several oil companies in the vicinity and passage of oil-carrying barges is constant. Throughout the night preceding the damage complained of, a British tanker had been discharging cargo about a mile and a half from the basin and in the morning oil covered the surrounding waters. It is fully as probable that the oil found in the Yacht Basin originated with this pumping operation, or some of the general traffic on the Kill, as that it was traceable to Atlas.

██ In view, therefore, of what the record shows or suggests, we think the trial court has failed to observe properly the burden of proof which was resting upon the libelant to show by credible evidence or reasonable inference therefrom that the pollution complained of came from the barges sued, or from either one separately. We are left with the fairly firm conviction that neither barge contributed to the injuries for which suit is brought; consequently the findings must be held "clearly erroneous" under Fed.Rules Civ.Proc. rule 52(a), which we have often applied in admiralty. See, e. g., Petterson Lighterage & Towing Corp. v. New York Cent. R. Co., 2 Cir., 126 F.2d 992; Cannella v. United States, 2 Cir., 179 F.2d 491; Gibbons v. United States, 1 Cir., 186 F.2d 488; and see also United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Gindorff v. Prince, 2 Cir., 189 F.2d 897, 898. The libel therefore cannot be sustained.

Having reached this conclusion, we need not consider respondents' further contentions that the assignment was invalid under New Jersey law (thus rendering libelant not the "real party in interest," cf. F.R. 17[a]), that certain

testimony was erroneously accepted, and that in any event the findings did not identify the separate boats injured or establish actual injury sufficiently to justify the reference to a commissioner to compute damages.

The decree is reversed for dismissal of the libel.