THE YFNX-6.

THE NORA V.

Petition of The UNITED STATES of America, as owner of the Navy Barge YFNX-6, for exoneration from or limitation of liability.

No. 3827.

No. 3875.

United States District Court
D. Maryland,
Admiralty Division.

Nov. 8, 1957.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md. (Charles S. Haight, Jr., Atty., Admiralty & Shipping Section, Department of Justice, Washington, D. C., of counsel), for petitioner.

Skeen, Wilson & Coughlin, Baltimore, Md., Rollins, Smalkin, Weston & Andrew, Josiah F. Henry, Jr., Dallas F. Nicholas, and Harry K. Lott, Baltimore, Md. (John H. Skeen, Jr., Baltimore, Md., of counsel), for claimants.

THOMSEN, Chief Judge.

On July 7, 1954, the YFNX-6, a wooden-hulled Navy barge, under tow of the U. S. S. Bannock, foundered and sank in the middle of Delaware Bay. Eight days later the Nora V, a wooden-hulled fishing vessel, filled with water and capsized immediately after striking an unseen object in the bay four miles west of the wreck. Claimants—the owner and operator of the Nora V, her surviving passengers, and the personal representatives of three passengers who lost their lives—contend that the Nora V was caused to sink by striking debris which had floated free from the wrecked YFNX-6. The United States denies this and seeks exoneration from or limitation of liability. The taking of evidence with respect to damages has been postponed until the question of liability is settled.

For the reasons set out below— (1) I find that the loss of the YFNX-6 was caused by negligence on the part of the tug Bannock. (2) I further find

that there was no other negligence on the part of the government, either in sending out the barge or in preventing the escape of debris from the wreck. (3) Finally, and most importantly, I am satisfied that the peculiar damage to the hull of the Nora V was not caused by anything that came off the YFNX-6 The claimants, therefore, have not proved their case, and the government should be exonerated from liability.

### Findings of Fact

Certain facts are undisputed, but on many points there is conflicting testimony. These findings are made after reviewing all of the evidence referred to in the elaborate briefs and reply briefs filed after the trial and considering the very able oral arguments made by the two advocates. The findings are supported by testimony and other evidence which is not referred to in detail. Testimony to the contrary was sometimes rejected because I did not find it credible, sometimes because it was limited or explained by other evidence.

### The Sinking of the YFNX-6

The YFNX-6, a wooden-hulled barge carrying a two-story wooden deckhouse and a derrick, was built in 1942. Although weakly constructed she had been towed about in the Chesapeake Bay and its tributaries. Early in 1954 the Navy decided to send her to New London, and she was given a thorough inspection at Washington on March 4, and April 1, 1954. Ten worm-infested hull planks were found, and some wormy outside sheathing, but no other signs of rot. She was towed up the Chesapeake Bay to Baltimore, where she was further inspected by a wooden-hull expert, who drew up job specifications for her repair.

The hull work was done by a Baltimore firm which specializes in the repair of wooden vessels. The defective hull boards were replaced, and the bottom was entirely recaulked. Each hull plank was tested further during this process. The yard superintendent and other personnel repeatedly inspected the work as it progressed, looking for any additional indications of rot or deterioration, for this would have meant additional work. No further signs of rot were found, either by the shipyard personnel, by the officer in charge of the work, or by two civilian Navy inspectors, who reported that the planking other than that to be removed appeared sound and that the keelson exposed by the removals appeared sound.

The hull planks at one corner of the barge were "sprung" while on the marine railway, but this incident was noted by the inspectors, and the condition was corrected. The after starboard corner of the barge sagged one or two inches, but that was not surprising in a barge the size of the YFNX-6, and is not significant in this case. All defects were repaired, and the barge appeared sound and dry the day before she was taken over by the Bannock. I do not accept the testimony of the captain of the Bannock with respect to the quantity and distribution of water in the hold on the morning of July 7. There may have been a little water in one corner of the hold, but I find that there was no appreciable hull leakage. The barge did not tilt in any direction, at her berth or during her last voyage, except for the normal tilt while under tow.

The chief Navy inspector at Baltimore, however, recommended that the maximum safe speed at which the barge might be towed was five knots, and although the PRNC officer in charge of the barge thought the figure might have been seven knots, the inspector's recommendation prevailed and the captain of the Bannock was so notified. The reason for the low speed was the weak construction of the YFNX-6; with a flat bottom, no form at all, and no pointed bow, a greater speed would create "terrific suction". The inspector was worried about the chance of sucking the caulking out or pulling boards off.

Despite this warning, after crossing the Chesapeake Bay and passing through the Chesapeake and Delaware Canal, the Bannock towed the barge down the Dela-

ware Bay at a speed of twelve knots. There were no operative bilge pumps and no riding crew on the YFNX-6. When she was about a mile or two south of Fourteen Foot Bank along the west side of the main channel, one of her bottom boards was sucked out, and she sank in 38 feet of water, so that the starboard side of her deckhouse remained above the surface. She was finally grounded near the south end of Fourteen Foot Bank, 3.7 miles at a bearing of 314° from Brandywine Shoal Light, and a little west of the channel. At the time she sank the towing speed had been reduced to five knots, because the tow was being passed by two tankers proceeding down the channel at a rapid rate, which caused swells about two or three feet high. The damage, however, had already been done. Whether or not the swells contributed to the final sucking out of the board, I find that the loss of the YFNX-6 was caused by negligence on the part of the Bannock in towing the barge at too great a speed.

### The Care of the Wreck Between July 7 and July 15.

The wreck was promptly buoyed. Warnings of its presence were issued in the Coast Guard's Notices to Mariners. The Bannock stood by the wreck from July 7 until relieved on July 14, except for two short trips to Lewes on July 10 to pick up and drop two salvage officers. Those officers recommended that the wreck be demolished. The Chief of Naval Operations and the Secretary of the Navy approved its destruction, as required by 34 U.S.C.A. §§ 491, 546e, and a demolition vessel, the Salvager, arrived on the scene authorized to proceed, only seven days after the YFNX-6 sank. Hampered by wind, the Salvager could not set off her first charge until July 17, two days after the loss of the Nora V. Demolition operations were completed July 23. There was no unreasonable delay in demolishing the wreck.

Nor was there any negligence in retrieving the debris which came off the YFNX-6. Little debris came off until July 12, and most of it was retrieved by the Bannock and the fishing boats which gathered around the wreck. On July 12 sections of bulkheads from the deckhouse began to float away in a rough sea. The Bannock and her small boat devoted July 13, to retrieving debris and storing it on the Bannock's fantail. The largest piece recovered was about two or three times as large as an ordinary desk top. An officer testified: "The total thickness would be approximately six inches, but that is not solid wood. That is comprised of light plank or sheathing, fastened to, nailed to sections of two by four with another layer of light planking or sheathing under the inner side, making a total thickness of about six inches like an air sandwich". These sections were freshly painted and readily identifiable. Such debris was relatively light, floated buoyantly and flat on the surface, and was easy to see. The heaviest single piece the Bannock retrieved weighed about a hundred pounds.

The Salvager relieved the Bannock on the morning of July 14. Captain Leonard of the Salvager had seen no debris on his way up the bay, and saw none floating in the vicinity of the YFNX-6 on July 14. That night a storm blew out of the northeast, and the Salvager first observed debris breaking loose from the barge on the morning of July 15. Once again, the objects were from the superstructure. Captain Leonard testified: " * * * about daylight we noticed that parts of the superstructure and parts of the roof and bulkheads commenced to pop up out of the water". The Salvager put four small boats into the water on July 15 to retrieve this debris. The wreckage was painted and easy to see: "It was on the surface of the water bobbing up and down with the waves". There was "wonderful visibility; it was a very sunshiny day". This is the day the Nora V, four miles to the west, hit an object which nobody on board saw, either before or after her capsizing.

The debris which the Salvager retrieved on July 15 was similar to that

recovered by the Bannock on July 13. Captain Leonard described it: "Partial bulkheads, things like that, * * * fairly light * * * It was all in a horizontal position." For reasons set out below, I have found that if the damage to the Nora V was caused by a floating object, that object must have weighed around 2,000 pounds and must have been floating vertically rather than horizontally.

The bulkheads and roof sections were the heaviest pieces which broke off the YFNX-6 until after the loss of the Nora V. The only other debris which came loose during the interval was the sheathing which protected the sides of the hull, flat boards an inch or two thick, four to six feet long, and ten inches wide. The heavier timbers in the YFNX-6's hull remained in place until July 17, when the demolition work began.

Such debris as may have eluded the retrieving operations floated with the tide and wind. There is both theoretical and eye witness evidence as to where it went.

The Nora V sank four nautical miles west of the YFNX-6, after striking an unseen object at a point in the western part of the Mohawk Slough, and north and west of the Lower Middle, close to Hawknest Shoal. The prevailing tides and winds were opposed to the progress of barge debris that far west in so short a period of time.

The Coast and Geodetic Survey tidal current charts show that the ebb and flood tides in the bay run generally NNW and SSE. The ebb tide is usually of greater duration than the flood, so debris normally moves south rather than north.

Captain Shackelford, a former Coast Guard inspection officer, testified that, in his opinion, it would be impossible for debris originating a mile south of Fourteen Foot Bank Light to be carried four miles due west in a period of seven or eight days. He stated that in four days such debris could have gotten as far west as the Lower Middle; however, in that amount of time it could not have gotten west of the Lower Middle. He could not say that such debris would never get west of the Lower Middle; the winds would also be a factor.

During the period July 8 to July 12, the winds were more from the east than from the west. But during the period July 13 to July 15, when most of the debris came off the YFNX-6, and when the continued play of wind and wave would have had the greatest chance of tearing off a submerged plank, the winds were mostly from the west.

Two witnesses for claimants testified that just at the change from flood to ebb, one could expect a movement of water from the center of the channel toward the west. This condition would not last over an hour. We are concerned, however, not with a phenomenon which may be observed just at the change of tide, but with the chance of a floating object drifting four miles due west over a period of eight days or less. In line with the opinion of Captain Shackelford, I find that such a movement was so unlikely as to be practically impossible.

Other evidence supports this conclusion. Small boats from the Bannock or the Salvager went out in all directions, on several occasions, and the whole area was patrolled by helicopter, by airplanes and by boats during the search for the survivors of the Nora V on the morning of July 16, but no debris from the YFNX-6 was seen by anyone more than 1500 yards west of the wreck. I do not believe Captain Heideck's testimony to the contrary. The evidence shows that almost all of the debris moved with the tides NNW and SSE, in and around the main ship channel.

The movements of the Nora V after she capsized, and of Captain Heideck and the other survivors through the water, are revealing. They were all carried by the tide and wind, and were all found several miles to the southeast of the place where the Nora V capsized.

Claimants' Coast Guard witness, Keeley, found debris eight miles SSE of

the YFNX-6, near Brown Shoal, on July 16, but found none to the west of the YFNX-6. Keeley had lookouts posted, and was "looking for anything that might look like a man". All of this evidence supports the conclusion that it is most unlikely that any debris from the YFNX-6 ever got as far west as the place of the accident to the Nora V.

### Other Debris in the Bay

Many witnesses testified that there is always debris in the Delaware Bay— trees, pilings, logs, ten by tens, and wreckage of all sorts, drifting down from Philadelphia and other points on the river. As one witness expressed it, you may expect "a certain amount of piling that are maybe broken off or lost during construction, heavy timbers, and all that sort of thing * * *." Such debris in the river flows toward the bay and the ocean. Government boats in the river try to pick it up, but they cannot get it all. After considering all of the conflicting evidence, I am satisfied that the loss of the YFNX-6 did not noticeably increase the amount of debris in the western approaches to the fishing grounds.

Leftwich, a Coast Guard Chief Petty Officer, who was stationed in the Delaware Bay area for fourteen months and participated in the Nora V search, testified about the "deadheads" he had seen in the river. A "deadhead" is a piling that is waterlogged on one end and floats in an upright position. He testified that "the deadheads are one thing we are most afraid of. We call them 'hull-busters'. They build docks with pilings, and maybe those tankers coming into the docks will knock one off, down where they are driven into the ground they might break it off, and that portion, being in the water for so many years, is already waterlogged, but the piece that has been out of the water still has flotation in it. So if it is 20 or 30 feet long, the tide itself carries it downstream, and if the water is not deep enough for it to flow free, the current will carry one end of the piling under while the lower end drags on the bottom.

* * * It will be floating, but it might be submerged, because one end is dragging on the bottom and the tidal current is dragging that end under maybe a foot or two. Sometimes it is a foot or two submerged and sometimes it is just on the surface." Leftwich stated on cross-examination that during his patrol periods he noticed a visible "hull-buster" every couple of months.

In various sections of the bay, at depths of 12 to 30 feet, oyster stakes or shad stakes have been driven into the bottom. These stakes are usually small trees, with some or all of the branches trimmed off, and are so driven that they protrude several feet out of the water. From time to time ice shears off the tops of some of the stakes, just below the water line, so that they are a distinct menace to navigation, piercing the bottoms of small boats. I find, however, that there were no such stakes in the immediate vicinity of the point at which Captain Heideck places the accident to the Nora V, although there were some stakes not very far to the south.

### The Loss of the Nora V

On July 15, at about 8 a. m., the Nora V left Bowers Beach on the west shore of Delaware Bay for the fishing grounds in the middle of the bay. Besides her skipper, Captain Heideck, there were eight persons aboard. The start had been delayed for several hours because of heavy northwest winds, following a storm the night before. After fishing in the neighborhood of the wreck for several hours, all of the fishing boats started for home, the Nora V among the last. The boat was running into the wind on the way back, with waves running up to two feet high. She proceeded west by north across the Lower Middle and Mohawk Slough, and had almost reached Hawknest Shoal, when one of the passengers noticed a great deal of water in the cockpit. The water rose rapidly, life preservers were issued to all, and the Nora V capsized within a few minutes. Captain Heideck, at the wheel, had seen nothing in the water

which might have struck the boat, and had felt nothing unusual. None of the passengers had seen anything in the water, and only one had really felt anything unusual, a thump, a minute or two before he noticed the water in the boat. The accident must have occurred about where the Nora V foundered, because the inrushing water would have prevented any appreciable forward progress.

When the Nora V was discovered the next day, she was floating upside down. One of her bottom boards, nine inches wide and five feet long, running from the keel to the starboard chine, had been pushed up into the boat; the starboard keelson immediately above the board had been broken, and so had a cross member attached to the keelson. The next bottom board aft was loose. There was no other damage of any kind, not even a scratch on the bottom.

While breasting one of the small waves, the Nora V must have dropped a couple of feet onto a floating or stationary object, of which one dimension was certainly less than nine inches, and one other dimension was probably not over one foot. She must then have risen free on the next wave, loosening the adjoining board, but not any other bottom board. If the object which the Nora V struck was floating, it must have been floating vertically or almost vertically. The parties are agreed on this. It must have been very heavy, waterlogged over most of its length, or held down by metal at one end.

All factors considered, the object with which the Nora V came into contact must have weighed about 2,000 pounds, if it was a floating object. The estimated weight given by claimants' expert was about 1,088 pounds, but various factors convince me that it must have been nearly twice that weight. One of the "hull-busters" described by the witness Leftwich would fit the specifications exactly. Of course, if the object was stationary, like a fish stake or the mast of a sunken sail boat, it might have been lighter.

I find as a fact that the loss of the Nora V was probably caused by contact with a heavy floating object, such as a "hull-buster".

I further find that it could not have been caused by any of the debris which came off the YFNX-6. It is highly improbable that any debris from the YFNX-6 could have gotten as far west as the place of the accident within eight days or less, under the weather conditions prevailing. But granting the possibility, I find as a fact that no piece or combination of pieces which escaped from the YFNX-6 could have caused the peculiar damage which the Nora V sustained. The one board from the bottom of the YFNX-6 which the evidence shows was sucked out, could not have caused the damage to the Nora V. It was entirely too light, according to the testimony of all experts, and there is no reason to expect that it would have floated in a vertical rather than a horizontal position.

I further find that it is possible but improbable that the Nora V struck some stationary object.

Since I have found that the loss of the YFNX-6 did not noticeably increase the amount of debris in the fishing grounds and the approaches to them, there is no factual basis for the government's contention that negligence on the part of Captain Heideck caused or contributed to the loss of the Nora V. If I had found that such debris was distributed over such an area and in such volume as Captain Heideck claimed, I would find him negligent in taking a party in a small boat into such an area; competitive necessity would not be a justification.

### Law

It is not enough for the claimants to show negligence on the part of the government in the sinking of the YFNX-6; they must also show by a fair preponderance of evidence that debris from the YFNX-6 was a more probable cause than any other of the damage to the Nora V. Salaky v. The Atlas Barge No. 3, 2 Cir., 208 F.2d 174; Newtown Creek Towing Co. v. Astoria Importing & Manufacturing Co., 2 Cir., 47 F.2d 578;

Wisconsin Central Ry. Co. v. Reiss S. S. Co., 7 Cir., 45 F.2d 366; The No. 4, D.C. S.D.N.Y., 27 F.2d 442; The Oakland, 4 Cir., 241 F. 66; The Amanda Powell, 4 Cir., 14 F. 486. The same burden rests upon the plaintiff in other types of cases. Ebhardt v. Safeway Stores, 4 Cir., 227 F.2d 379; Ruback v. McCleary, Wallin & Crouse, 220 N.Y. 188, 115 N.E. 449; Houston v. Republican Athletic Association, 343 Pa. 218, 22 A.2d 715.

Claimants state in their reply brief "we do not argue that a circumstantial case is made out when a cause for which respondent is not responsible is 'equally' probable". In the instant case a cause for which the government is not responsible, a heavy floating object from some source other than the YFNX-6, is not merely an equally probable cause, it is the most probable cause of the damage to the Nora V.

■ Claimants seek to avoid the effect of their failure of proof by reliance on the so-called Pennsylvania rule, announced by the Supreme Court in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148. The steamer Pennsylvania collided with the schooner Mary Troop in a fog. There was no dispute about the fact that the physical cause of the damage was the impact between the two vessels. The steamer was guilty of immoderate speed. The schooner had been ringing a bell, whereas a navigation statute called for a foghorn. The question was whether that statutory violation contributed to the physical cause of the damage, i.e. the collision. In ordering divided damages, the Supreme Court held that since the schooner had violated a statutory rule of navigation, she had the burden of showing "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." 19 Wall. at page 136, 86 U.S. at page 136.

Claimants contend that the loss of the YFNX-6 was a violation of the Wreck Statute, 33 U.S.C.A. § 409, which provides:

"§ 409. *Obstruction of navigable waters by vessels; floating timber; marking and removal of sunken vessels.* It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as 'sack rafts of timber and logs' in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for."

Claimants then argue that since the sinking of the YFNX-6 was due to negligence on the part of the government, the government must show that the loss of the Nora V could not have been caused by debris from the YFNX-6.

■ There are several reasons why this is not a sound argument. The Pennsylvania rule does not apply where the physical cause of the damage is not known. Any plaintiff, marine or shoreside, who seeks to hold a defendant liable for injuries, must show: (1) the physical cause of his injuries; (2) fault on the part of the person sought to be held

responsible; and (3) a causal connection between such fault and the physical cause. The Pennsylvania rule begins to operate after libelant has passed the second stage, but not before. The Pennsylvania rule does not shift the burden of proof on the first issue: the physical cause of the damage. Such proof is always a part of libelant's case. The argument advanced by claimants disregards the distinction between (1) the physical cause, or cause in fact, of a casualty, and (3) the causal connection between respondent's fault and the physical cause.

In Salaky v. The Atlas Barge No. 3, 2 Cir., 208 F.2d 174, there had been a statutory violation by the respondent. But the court did not hold that the statutory violation required the respondent to prove that its oil could not have caused the physical damage. On the contrary, libelant was required to prove the physical cause of the damage.

Claimants' theory was rejected by the Second Circuit in Automobile Insurance Co. v. United Fruit Co., 224 F.2d 72, where the court said: "In any event libellants can have no recourse to the doctrine of statutory fault because there is lack of evidence here that any statutory fault was a proximate cause of the fire." 224 F.2d at page 75.

Again, the statutory provision relied upon by the present claimants is different in nature from the statutory provisions involved in the cases which have applied the Pennsylvania rule. Those cases have dealt with specific duties imposed by statute, such as rules of the road, requirements with respect to licensed personnel, etc. The Wreck Statute, 33 U.S.C.A. § 409, quoted above, is primarily a criminal statute dealing with the marking and removal of wrecks. Sullivan v. P. Sanford Ross, 2 Cir., 263 F. 348, 350. For the purposes of civil liability, the provision forbidding the negligent sinking of vessels in navigable channels is simply declaratory of the obligation to exercise due care existing under the general maritime law. On the other hand, The Pennsylvania involved an explicit statutory rule of navigation, which superseded the schooner Mary Troop's general duty to exercise due care, and replaced it with a mandatory, specific duty: to blow a foghorn. It was beside the point for the Mary Troop to argue that by ringing a bell she was exercising due care under the circumstances; as the Supreme Court stated:

"To go into the inquiry whether the legislature was not in error—whether in fact a bell did not give notice to the steamer that the bark was where she was as soon as a foghorn would have done—is out of place. It would be substituting our judgment for the judgment of the law-making power. It would be admitting the validity of an equivalent for that which the statute has made a positive requirement. 19 Wall. at page 137, 86 U.S. at page 137."

Finally, there is much force in the recent comment by the First Circuit in Seaboard Tug & Barge v. Rederi A B/Disa, 213 F.2d 772, 775:

"We cannot believe that the Supreme Court in The Pennsylvania intended to establish as a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision no matter how speculative, improbable or remote."

This interpretation is supported by other authorities cited in the Seaboard Tug opinion. See, also, Mason v. Lynch Bros. Co., 4 Cir., 228 F.2d 709, at page 712, note 3. Claimants concede that there must be both temporal and spatial limits to the applicability of the Pennsylvania rule in such a case as this, but suggest no satisfactory formula for fixing those limits.

### Conclusions

1. The Pennsylvania rule is not applicable in this case to throw on the government the burden of showing that the damage to the Nora V could not have

been caused by anything which might have come off the YFNX-6.

2. Even if the rule did apply, the government has met that burden (a) by showing that it was practically impossible for any debris from the YFNX-6 to have proceeded four miles west, to the place of the accident, within eight days or less, and (b) by showing that nothing which came off the YFNX-6 was heavy enough to have caused the peculiar damage which the Nora V suffered.

3. Claimants have failed to prove their case and the government is entitled to exoneration from liability.

Counsel will prepare an appropriate decree.