The **AMERICAN WATERWAYS OPERATORS, INC., etc., et al., Plaintiffs,**
and
**Suwannee Steamship Company, etc., et al., Intervening Plaintiffs,**

v.

**Reubin O'D. ASKEW, as Governor of the State of Florida, et al., Defendants.**

No. 71–156–Civ.–J.

United States District Court,
M. D. Florida,
Jacksonville Division.

Dec. 10, 1971.

Healy & Baillie, Haight, Gardner, Poor & Havens, New York City, Fowler, White, Gillen, Humkey, Kinney & Boggs, Tampa, Fla., Kurz, Toole, Taylor, Moseley & Gabel, Rogers, Towers, Bailey, Jones & Gay, Jacksonville, Fla., for plaintiffs.

Daniel S. Dearing, Asst. Atty. Gen., Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION AND FINAL JUDGMENT

Before RONEY, Circuit Judge, and SCOTT and TJOFLAT, District Judges.

TJOFLAT, District Judge:

During the 1970 session the Florida Legislature passed the "Oil Spill Prevention and Pollution Control Act" [1] (hereinafter called the "Florida Act") in an attempt to prevent pollution by the shipping industry of waters within the territorial jurisdiction of the State of Florida. The Act imposes unlimited liability without fault upon virtually any vessel which discharges oil or any other pollutant while destined for or leaving any Florida port.[2] Onshore and offshore

1. Chapter 376, Florida Statutes Annotated; Chapter 70-244, Laws of Florida (all further citations to the act will be to Florida Statutes Annotated).

2. Section 376.12, Florida Statutes Annotated, provides in part:
    Liabilities of licensees.—Because it is the intent of this chapter to provide

terminal facilities are subject to the same liability.[3] The Act requires every owner or operator of a vessel using a Florida port or a terminal facility to pay whatever cleanup costs or damages may result from the discharge of pollutants [4] and to maintain satisfactory evidence of financial responsibility to satisfy such liability.[5] The Department of Natural Resources is empowered to

the means for rapid and effective cleanup and to minimize damages, any licensee and its agents or servants, including vessels destined for or leaving a licensee's terminal facility, who permits or suffers a prohibited discharge or other polluting condition to take place within state boundaries shall be liable to the state for all costs of cleanup or other damage incurred by the state and for damages resulting from injury to others. In any suit to enforce claims of the state under this chapter, it shall not be necessary for the state to plead or prove negligence in any form or manner on the part of the licensee or any vessel. If the state is damaged by a discharge prohibited by this chapter it need only plead and prove the fact of the prohibited discharge or other polluting condition and that it occurred.

" 'Pollutants' shall include, but not be limited to, oil of any kind and in any form, gasoline, pesticides, ammonia, chlorine, and other hazardous materials." Fla.Stat.Ann. § 376.031(7).

3. Terminal facilities and vessels are defined as:

"Terminal facility" means any water front facility of any kind, other than vessels not owned or operated by such facility, and related appurtenances located on land, including submerged lands, or on or under the surface of any kind of water, which facility and related appurtenances are used or capable of being used for the purpose of drilling for, pumping, storing, handling, transferring, processing, or refining oil or other pollutants, including, but not limited to, any such facility and related appurtenances owned or operated by a public utility or a governmental or quasi-governmental body. A vessel shall be considered a terminal facility only in the event of a ship-to-ship transfer of oil, petroleum products or their by-products, and other pollutants, and only that vessel going to or coming from the place of transfer and the terminal facility. With respect solely to application fees for licenses and annual license fees as required in this act, the words "terminal facility" shall not be construed to include the fuel storage tanks or other facilities of any marine service station having no more than twelve hundred (1200) gallons of pollutants in storage on the premises. Fla.Stat.Ann. § 376.031(9) as amended, Laws of Florida, 71–243.

"Vessel" includes every description of watercraft or other contrivance used, or capable of being used, as a means of transportation on water, whether self-propelled or otherwise, and includes barges and tugs. Fla.Stat.Ann. § 376.-031(12).

4. See note 2, *supra.*

5. Section 376.14, Florida Statutes Annotated, provides, in part:

(1) Each owner or operator of a terminal facility or vessel, including any barge, using any port in Florida shall establish and maintain under rules and regulations prescribed by the department of natural resources, evidence of financial responsibility based on the capacity of the terminal facility or tonnage of the ship, the cargo carried, and other similar factors to which the vessel could be subjected under this chapter. Financial responsibility may be established and maintained by any one (1), or a combination, of the following methods acceptable to the department:

(a) Evidence of insurance;

(b) Surety bonds payable to the governor of the state, conditioned to pay all costs and expenses of the cleanup of any discharge as well as damages caused to the state and any person;

(c) Qualification as a self-insurer; or

(d) Other evidence of financial responsibility satisfactory to the department.

(2) A bond filed with the department shall be issued by a bonding company authorized to do business in the state.

(3) Any claim for costs incurred by a terminal facility or vessel may be brought directly against the insurer or any other person providing evidence of financial responsibility. Any claim for costs of cleanup, civil penalties, or damages by, the state, and any claim for damages by any injured person, may be brought directly against the bond, the insurer, or any other person providing evidence of financial responsibility.

require any vessel transporting a pollutant in state waters to be equipped with specified containment gear and a crew trained in its use.[6] Prior to entering a Florida port, every vessel is subject to inspection by the port manager to determine the presence of the required containment gear and the seaworthiness of the ship.[7] He is required to notify all other ports in the state of any vessel refused entry to his port.[8]

Plaintiffs and intervenors include merchant shippers whose vessels use Florida ports in the course of transporting goods in foreign and interstate commerce; world shipping associations who insure three-fourths of the ocean-going tonnage against, among other things, liability for oil spillage; a substantial portion of the barge and towing industry operating along the Florida coast; and owners of oil terminal facilities located in Florida ports. They have challenged the validity of the Florida Act on several federal constitutional grounds. Plaintiffs' initial contention is that Florida has sought to legislate substantive maritime law which, under the United States Constitution, is exclusively within the federal domain. Secondly,

6. Section 376.07, Florida Statutes Annotated, provides in part:

Regulatory powers of department.—The department shall from time to time adopt, amend, repeal, and enforce reasonable regulations insofar as they relate to oil spills or discharges or the spills or discharges of other pollutants into the waters of this state or onto the coasts of this state.

(1) The regulations shall be adopted in accordance with the administrative procedure act, chapter 120.

(2) The department shall adopt regulations including, but not limited to, the following matters:

(a) Operation and inspection requirements for facilities, vessels, personnel, and other matters relating to licensee operations under this chapter, and specifically requiring that vessels transporting pollutants within state waters shall maintain on board such containment gear as may be required by the department with a crew trained in the use of the gear.

(b) Procedures and methods of reporting discharges and other occurrences prohibited by this chapter.

(c) Procedures, methods, means, and equipment to be used by persons subject to regulation by this chapter in the removal of pollutants.

\*　　\*　　\*　　\*　　\*

(f) Requirements for minimum weather and sea conditions for permitting a vessel to enter port and for the safety and operation of vessels, barges, tugs, motor vehicles, motorized equipment, and other equipment relating to the use and operation of terminals, facilities, and refineries, the approach and departure from terminals, facilities, and refineries and requirements that containment gear approved by the department be on hand and maintained by terminal facilities and refineries with adequate personnel trained in its use.

(g) Requirements that, prior to being granted entry into any port in this state, the master of a vessel shall report:

(1) Any discharges of oil or other pollutants the vessel has had since leaving the last port;

(2) Any mechanical problem on the vessel which creates the possibility of a spill; and

(3) Any denial of entry into any port during the current cruise of the vessel.

7. Section 376.08(2), Florida Statutes Annotated, provides:

The port manager shall have the authority to board any vessel prior to its entry into port in order to ascertain the seaworthiness of the vessel and the presence of required containment gear. Upon being notified of a discharge the port manager shall have authority to direct the vessel to anchor immediately or move to a specific dock and deploy containment gear or to move to the open seas and to take such other measures as he deems necessary. The port manager shall have the additional duty to inspect any terminal facility in his port to determine that adequate containment gear is on hand at the terminal facility.

8. Section 376.08(3), Florida Statutes Annotated, provides:

A port manager who refuses entry of any vessel into the port under his charge shall be required to notify all other ports in the state of his refusal of entry of that vessel.

they contend that the Act violates the Commerce Clause, since it seeks to regulate foreign and interstate commerce. Certain provisions of the Act are under piecemeal attack on Fourteenth Amendment due process and equal protection grounds. The resolution of the first of these contentions dictates the decision in this case, and the others will not be discussed.

■ The maritime law of the United States has evolved under Article 3, Section 2, of the Constitution which extends the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction." In a territorial sense that jurisdiction covers all waters navigable in interstate or foreign commerce, including state waters.[9] Maritime law governs virtually every facet of the shipping industry from the design and construction of vessels to the regulation of their day to day operations and the transactions in which they engage. It comprises traditional admiralty rules and concepts found initially in the European authorities. These rules and concepts have been augmented from time to time by the federal judiciary to accommodate needs distinctive to this nation. Further changes in the corpus of maritime law have been effected by a variety of congressional enactments and administrative regulations.[10] One of these congressional enactments is the Water Quality Improvement Act of 1970[11] (hereinafter called "W.Q.I.A.") which became law a few months prior to the effective date of the Florida Act. W.Q.I.A. provides plaintiffs with tangible evidence that the Florida Act is an unconstitutional intrusion into the federal maritime domain.

The W.Q.I.A. reinforces the national anti-water pollution policy. In this act Congress declared that there should be no discharge of oil into or upon the navigable waters and shorelines of the United States.[12] The owner or operator of a vessel or an onshore or offshore facility is subject to limited liability without fault for the costs expended by the government in cleaning up an oil spill.[13] Where the spillage results from willful negligence or misconduct, however, liability for such costs can be unlimited.[14] Evidence of financial responsibility sufficient to cover its potential liability must be given by any vessel of 300 gross tons or more that uses the navigable waters of the United States.[15] Additionally, the President is authorized to issue regulations requiring, among other things, that vessels maintain oil spill prevention equipment and be subject to boarding for inspection purposes at any time.[16]

In adopting W.Q.I.A. Congress anticipated that all hazardous substances, in addition to oil, capable of polluting navi-

9. "[T]he admiralty jurisdiction of the United States extends to all waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable in interstate or foreign commerce, whether or not the particular body of water is wholly within a state, and whether or not the occurrence or transaction that is the subject matter of the suit is confined to one state." Gilmore and Black, The Law of Admiralty, § 1–11, at 28–29 (1957) and cases cited therein. Arguably, this would include land-locked lakes which are "navigable-in-fact" in interstate commerce.

10. The "Necessary and Proper Clause" of the United States Constitution (Article I, Section 8, Clause 18), read in context with the "Admiralty Clause" (Article III, Section 2, Clause 1) confers upon Congress the power to enact legislation in the maritime field. Knickerbocker Ice Company v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

11. 33 U.S.C. § 1161 et seq.

12. 33 U.S.C. § 1161(b) (1).

13. The amount of liability of a vessel is limited to $100 per gross ton or $14,000,000, whichever is less. The liability of an onshore or offshore facility is limited to $8,000,000. 33 U.S.C. § 1161(f) (1), (2) and (3).

14. 33 U.S.C. § 1161(f) (1), (2) and (3).

15. 33 U.S.C. § 1161(p).

16. 33 U.S.C. § 1161(j).

gable waters would be subject to similar legislative treatment.[17] W.Q.I.A. required the President to promulgate regulations defining such hazardous substances and establishing methods and means for their removal.[18] He was also required to report to Congress, by November 1, 1970, on the desirability of enacting legislation to establish liability for the cost of removing hazardous substances discharged from vessels and onshore and offshore facilities.[19]

That the Florida Act constitutes unlawful intrusion into the exclusive federal admiralty domain is apparent when one observes the extent to which that act would change substantive maritime law. The most obvious changes would be in the liability now imposed by W.Q.I.A. and maritime rules on shippers and the operators of onshore and offshore facilities.

While both W.Q.I.A. and the Florida Act subject vessels and onshore and offshore facilities to strict liability for cleanup costs, the latter imposes a far greater measure of responsibility. For example, W.Q.I.A. would excuse a shipper who demonstrates that the oil spill was caused by act of God, an act of war, or the act or omission of a third party.[20] The Florida Act recognizes none of these defenses to a claim by the state for cleanup costs. The state is entitled to judgment simply by pleading and proving "the fact of the prohibited discharge."[21] Moreover, the amount of the recovery would be unlimited; whereas W.Q.I.A. would place a limit on exposure, as we have previously noted.[22]

17. 33 U.S.C. § 1162.

18. *Id.*

19. *Id.*

20. 33 U.S.C. § 1161(f).

21. See note 2, *supra.* Section 376.11 establishes the Florida Coastal Protection Fund. One of the purposes of the fund is to provide moneys to be used by the Department of Natural Resources in cleaning up oil spills. The state's recovery of cleanup costs—by simply pleading and proving the fact of a discharge under Section 376.12—provides revenue for the fund. If the party causing the oil spill wants to contend that the discharge was caused by an act of God, for example, he must petition the department *after* he has been held liable for the cleanup costs. If the Department, in the exercise of its discretion, concludes that the contention is well made, it may waive the State's right to reimbursement of the cleanup cost. Whether the petition is granted or not is a matter solely for the Department to decide, for its decision on the merits is not subject to judicial review as Section 376.11(6) (b) provides:

"The findings of the department shall be conclusive, as it is the legislative intent that the waiver provided in this paragraph is a privilege conferred, not a right granted."

22. See notes 2 & 13 *supra* and accompanying text. The potential for conflict is equally present between the regulatory

scheme envisioned by the Florida Act and present regulation under federal acts. Pursuant to the W.Q.I.A. the President was required to publish a National Contingency Plan to remove oil spills and to minimize damage and to promulgate regulations "consistent with maritime safety and with marine and navigation laws." 33 U.S.C. § 1161(c), (j). These regulations are to cover, for example, the establishment of

"procedures, methods, and requirements for equipment to prevent discharges of oil from vessels and from onshore facilities and offshore facilities, and * * * governing the inspection of vessels carrying cargoes of oil and the inspection of such cargoes in order to reduce the likelihood of discharges of oil from such vessels. * * *" 33 U.S.C. § 1161(j).

The Florida Act obligates the Department of Natural Resources to act in the same areas. See note 6 *supra.* The potential for conflict in these two regulatory schemes is obvious.

It is likely that regulations promulgated under the Florida Act would further be discordant with the Steamboat Inspection Act, Title 46, U.S.C. § 361 et seq., and regulations promulgated thereunder. Section 376.08(2), Florida Statutes Annotated, provides that

"[t]he port manager shall have authority to board any vessel prior to its entry into port in order to ascertain the seaworthiness of the vessel and the presence of the required containment gear."

**1247**

There is perhaps an even greater contrast between maritime law and the Florida Act in compensating state or private interests for property damage, as distinguished from cleanup costs. W.Q.I.A. creates responsibility for cleanup costs only and leaves undisturbed the remedies available under maritime law for private injury caused by oil spillage or other pollution. The federal courts have long considered oil pollution as a maritime tort for which damages may be awarded.[23] Compensation is recoverable for injury to property and allowances have even been made for consequential damages. In In re New Jersey Barging Corp.,[24] an oil spill case, the court approved the following language from the Commissioner's report:

> In the light of the * * * authorities, it would seem to the Commissioner that he is authorized, and in fact

required, to make award of compensation for such annoyance, inconvenience and discomfort suffered by particular claimants to the extent of and in an amount commensurate with the annoyance and discomfort proven.

The recovery of damages in such cases is predicated on proof of negligence or unseaworthiness. The owner of a seaworthy vessel would not be liable, for example, if he encountered an extraordinary peril which resulted in a non-deliberate and non-negligent pollution of the shoreline. Even if fault were established, the vessel owner's financial responsibility for property damage would be limited to the value of the vessel at the end of the voyage, plus the "freight then pending," unless the damage was caused with the owner's "privity or knowledge." [25]

At the same time the Steamboat Inspection Act, together with the regulations issued pursuant thereto, sets up a detailed and comprehensive scheme, administered by the United States Coast Guard, for maintenance, inspection, and regulation of all vessels (except motor boats, which are otherwise provided for) propelled in whole or in part by mechanical or electrical power in the navigable waters of the United States. 46 U.S.C. §§ 361, 362. The Federal scheme is in consonance with the International Convention for the Safety of Life at Sea, 1960, T.I.A.S., 16 U.S.T. 185, 536 U.N. T.S. 27, which has been ratified or adhered to by all maritime nations, including the United States. Here again, conflict between the regulations under the Florida Act and the federal law appears unavoidable.

23. *See, e. g.,* Fireman's Fund Ins. Co. v. Standard Oil Co., 339 F.2d 148 (9th Cir. 1964); Salaky v. Atlas Barge No. 3, 208 F.2d 174 (2nd Cir. 1953); California, By and Through Dept. of Fish and Game v. S. S. Bournemouth, 307 F.Supp. 922 (C.D.Cal.1969); Petition of New Jersey Barging Corp., 168 F.Supp. 925 (S.D.N.Y.1958). Since the Congressional enactment of the Admiralty Extension Act in 1948 (46 U.S.C. § 740) "all cases of damage or injury, to person or property, caused by a vessel on navigable water, *notwithstanding that such damage or injury be done or consummated on land"*

(emphasis added) are considered maritime torts and thus within the admiralty jurisdiction. Petition of New Jersey Barging Corp., *supra.*

24. 168 F.Supp. 925, 937 (S.D.N.Y.1958).

25. United States Limited Liability Act, 46 U.S.C. § 183 et seq. No state statute can override this "Limitation Statute" within the territorial jurisdiction of the federal maritime law. In Butler v. Boston & Savannah Steamship Co., 130 U.S. 527, 555, 9 S.Ct. 612, 618, 32 L.Ed. 1017 (1889), the Supreme Court observed:
> "The law of limited liability, as we have frequently had occasion to assert, was enacted by congress as a part of the maritime law of this country, and therefore it is co-extensive, in its operation, with the whole territorial domain of that law."
In holding that a Massachusetts wrongful death action, arising from a death occurring in the admiralty jurisdiction, was subject to the "Limitation Statute", the Court went on to say:
> "It is unnecessary to consider the force and effect of the statute of Massachusetts over the place in question. Whatever force it may have in creating liabilities for acts done there, it cannot neutralize or affect the admiralty or maritime jurisdiction or the operation of the maritime law in maritime cases. Those are matters of national interest. If the territory of the state technically extends a marine

Under the Florida Act, however, liability without fault is the foundation for "damage incurred by the state and for damage resulting from injury to others," just as it is in the case of cleanup costs. By substituting absolute liability for proof of negligence or unseaworthiness as a condition to unlimited recovery, the Florida Act, if valid, would materially change the substantive maritime law governing the disposition of claims arising from the pollution of coastal waters.

■ It is well settled that state legislation is invalid where it is in contravention with general admiralty rules or congressional enactments in the maritime field. In the landmark *Jensen* case,[26] the Supreme Court, in holding that the New York State Workmen's Compensation Statute could not constitutionally be applied where an accidental death occurred on a vessel afloat in navigable waters within New York's boundaries, said:

> And plainly, we think, no such legislation is valid if it contravenes the essential purpose expressed by act of Congress or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations. This limitation, at the least, is essential to the effective operation of the fundamental purposes for which such law was incorporated into our national laws by the Constitution itself.[27]

> If New York can subject foreign ships coming into her ports to such obligations as those imposed by her Compensation Statute, other States may do likewise. The necessary consequence would be destruction of the very uniformity in respect to maritime matters which the Constitution was designed to establish; and freedom of navigation between the states and with foreign countries would be seriously hampered and impeded. * * * The legislature exceeded its authority in attempting to extend the statute under consideration to conditions like those here disclosed. So applied, it conflicts with the Constitution and to that extent is invalid.[28]

The Florida Act here constitutes a far greater intrusion into the federal maritime domain than the New York statute in the *Jensen* case. If applied to the plaintiffs and intervenors in this case, the Florida Act would effect—in the words of *Jensen*—the "destruction of the very uniformity in respect to maritime matters which the Constitution was designed to establish; and freedom of navigation between the states and with foreign countries would be seriously hampered and impeded."

This is not a situation in which a state legislature has sought to act in an area of purely local concern and its enactment is no real encroachment on federal interests. Rather, this is a case where the State purports to impose upon shipping and related industries duties which under the federal law they do not bear. It can hardly be said that Florida is not seeking to regulate conduct in the federal maritime jurisdiction. We need not belabor the point that to permit the states severally to regulate these industries as Florida seeks to do would sound the death knell to the principle of uniformity.

■ Defendants argue that, to the extent the Florida Act goes beyond W. Q.I.A., it fills a "void" in the maritime law and is justifiable under the "gap theory."[29] This theory presupposes that maritime law is an incomplete system,

league beyond the seashore, that circumstance cannot circumscribe or abridge the law of the sea." 130 U.S. at 557–58, 9 S.Ct. at 619.

26. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

27. *Id.* at 216, 37 S.Ct. at 529.

28. *Id.* at 217–18, 37 S.Ct. at 529.

29. *See,* Currie, "Federalism and the Admiralty," The Supreme Court Review 1960, 158 at 166–73.

with numerous gaps that can be filled by state statutes. This is to say, if the maritime law affords no remedy, the states may provide one. The Supreme Court's recent decision in Moragne v. States Marine Lines, Inc.[30] clearly puts such a theory to rest.

In that case the Court had before it the question of the applicability of the Florida Wrongful Death Statute [31] to a claim arising out of the death of a longshoreman killed while working aboard a vessel in navigable waters within the State of Florida. Neither the general maritime law nor Congressional enactment provided a remedy in the situation. The District Court and the Court of Appeals, citing The Tungus v. Skovgaard,[32] held that the state statute should be invoked to provide the remedy as well as the basis for recovery, that is, negligence.

Under maritime law, however, States Marine Lines owed plaintiff's decedent the duty to provide a seaworthy vessel in addition to the duty to exercise due care. Plaintiff therefore argued that an action was maintainable for a breach of either duty.

The Supreme Court rejected the notion that the absence of a federal statute or a maritime rule on the subject compelled the conclusion that state law must govern. It held that admiralty was fully capable of fashioning a remedy for the breach of substantive duties imposed by general maritime law and thus directed the district court to shape the remedy on remand. At the same time the Court observed that the Florida law of negligence has no place in the maritime field. The decision clearly reinforced the policy of uniformity and is an indication that admiralty cannot tolerate the inconsistency inherent in accommodating state remedial statutes to exclusively maritime substantive concepts.

Another argument advanced by defendants is that the Florida Act is valid under the following provision of W.Q.I.A.:

> Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil into any waters within such State. 33 U. S.C. § 1161(o) (2).

It has long been recognized that Congress is powerless to confer on the states authority to legislate within the admiralty jurisdiction [Knickerbocker Ice Company v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920);[33] The Lottawanna, 21 Wall. (88 U.S.) 558, 22 L. Ed.2d 654 (1875); The Steamer St. Lawrence, 1 Black 522, 66 U.S. 522, 17 L.Ed. 180 (1862)] and we cannot presume that W.Q.I.A. was an attempt to do so. There is nothing in the language of the act which purports to grant any such legislative authority to the states. The statement that Congress did not intend to preclude state imposed liability for oil pollution simply means that the states are free to enforce pollution control measures that are within their constitutional prerogative.

For the foregoing reasons we conclude that the Florida Act in ques-

30. 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed. 2d 339 (1970).

31. Fla.Stat.Ann. § 768.01.

32. 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959).

33. In the *Knickerbocker* case the Court, speaking to the question of state legislative authority in the maritime field, said:

"The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law and empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction. *Moreover, it took from the states all power, by legislation or judicial decision,* to contravene the essential purposes of, or to work material injury to, characteristic features of such law or to interfere with its proper harmony and uniformity in its international and interstate relations." 253 U.S. at 160–161, 40 S.Ct. at 441. (Emphasis added.)

tion cannot constitutionally be applied to the plaintiffs and intervenors and to the activities in which they engage. The question thus arises as to whether the Act is severable. Although it contains a severability clause,[34] such a provision is by no means binding on a court empowered to determine the constitutionality of a statute. The rule was explained by the Supreme Court in Carter v. Carter Coal Co.:[35]

> Whether the provisions of a statute are so interwoven that one being held invalid the others must fall, presents a question of a statutory construction and of legislative intent, to the determination of which the statutory provision becomes an aid. "But it is an aid merely; not an inexorable command." Dorchy v. Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 325, 68 L.Ed. 686. The presumption in favor of separability does not authorize the court to give the statute "an effect altogether different from that sought by the measure viewed as a whole." Railroad Retirement Bd. v. Alton R. Co., 295 U.S. 330, 362, 55 S.Ct. 758, 79 L. Ed. 1468.

> The statutory aid to construction in no way alters the rule that in order to hold one part of a statute unconstitutional and uphold another part as separable, they must not be mutually dependent upon one another.

■ When a federal court is called upon to rule on the constitutionality of a state statute containing a severability clause, the court will look to the decisions of the state court on the effect of such a clause.[36] In Cramp v. Board of Public Instruction [37] the Supreme Court of Florida made the following pronouncement on the question of severability:

> The rule is well established that the unconstitutionality of a portion of a statute will not necessarily condemn the entire act. When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.[38]

■ In the Florida Act there are no provisions which, though standing by themselves might be considered unobjectionable, are not so interwoven in purpose and scheme with the invalid provisions of the Act as to permit the operation of the severability clause. The announced intent of the Florida Legislature was to "deal with the hazards and threats of danger and damage posed by . . . transfer of pollutants between vessels, between onshore facilities and vessels, and between offshore facilities and vessels within the jurisdiction of the state and state waters. . . ." [39] Each provision of this statute was enacted to realize this intent and each would affect the industries in which plaintiffs and intervenors engage. The provisions that do not directly frustrate the federal maritime law are so few that, considered together, they would not comprise a coherent legislative scheme. Accordingly, the Act in its entirety must fall.

In consideration of the foregoing, it is Ordered:

1. Chapter 70–244, Laws of Florida, as amended in Chapter 376, Florida Statutes Annotated, is hereby declared

34. Laws of Florida, 70–244 § 23.

35. 298 U.S. 238, 313, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936).

36. Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

37. 137 So.2d 828 (Fla.1962).

38. *Id.* at 830.

39. Fla.Stat.Ann. § 376.021(3) (a), (4) (a).

to be in violation of Article III, Section 2, Clause 1 of the Constitution of the United States and is therefore null and void and without effect.

2. The temporary restraining order entered by Judge Charles R. Scott on March 19, 1971, enjoining the enforcement of said chapter and any regulations promulgated thereunder is hereby made permanent; provided that nothing in this final judgment shall be construed to prohibit the defendants from continuing to pay salaries of current employees out of the Coastal Protection Trust Fund.

3. This memorandum opinion and final judgment shall constitute the final judgment of this Court as to all issues presented in this action.