**WISCONSIN CENT. RY. CO. et al. v. REISS S. S. CO.**

No. 4388.

Circuit Court of Appeals, Seventh Circuit.

Dec. 5, 1930.

W. P. Crawford and R. E. Anderson, both of Superior, Wis. (Hayes, Coleman, Darnieder & Hayes, of Milwaukee, Wis., and Hughes & Anderson, of Superior, Wis., of counsel), for appellants.

Thomas H. Garry, of Cleveland, Ohio, Harney B. Stover, of Milwaukee, Wis., Gilbert R. Johnson and Goulder, White & Garry, all of Cleveland, Ohio, and Stover & Stover, of Milwaukee, Wis., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge.

This suit was brought by appellee (libelant) against appellants to recover damages for injuries to the freight steamer Geer, the charge being that appellants, "in connection with the work of removing the old bridge and the erection of the new bridge, had negligently caused or permitted dangerous obstructions to remain in the bottom of the river in the navigable channel of said draw, which constituted a menace to navigation, such as would cause damage to vessels navigating through said draw in a careful and proper manner and that it was upon such obstructions that said steamer Geer rubbed and stranded, causing the damage which said steamer sustained."

About a mile and a half up from the mouth of the Manitowoc river, a navigable stream, is the Soo Line Railroad bridge, located just above a bend in the river. Boats passing through the draw had to make a right angle turn as shown in the plat below:

Under plans approved by the government, appellants, the owners and the contractor, widened the water course from 65 feet between piers to 100 feet between piers by setting back the pier on the port side 8 feet and the starboard pier about 27 feet. By starboard pier, as here used, is meant the pier on the right-hand side going upstream.

The government permit required:

"All parts of the existing bridge * * * not utilized in the new structure shall be completely removed from the channel to a depth of at least 25 feet below low water datum, not later than 60 days after the said new bridge has been opened to traffic."

The river traffic through the bridge was not closed at any time, but the new bridge was completed August 6, 1926, so that the new bridge was from that time open to traffic.

On October 14, 1926, there remained in the river parts of the old structure, consisting of stones and broken-off piles, less than 25 feet below low-water datum. On that day, the Geer, going upstream, loaded with 6,400 tons of crushed stone and drawing 18'2" of water, stranded while passing through the draw.

Appellee recovered on the theory that the Geer ran upon the submerged piles, which caused the steamer to list to port, whereby the boat's bottom, on the port side, was thrown down upon the stones, not removed by appellants.

The piers and the submerged piles are definitely located by the plats. The location of the damage to the bottom of the boat is agreed upon, as being on the port side, beginning near the stem, close to the keel line, and extending back about 90 feet on a line about 3 feet from the keel. Then the marks are shown as beginning about 15 feet from the keel and about 50 feet from the stem, extending back half the length of the boat, where they end almost at the edge of the boat on the port side, going gradually farther from the keel line. Those are the injuries complained of. Some small marks are shown back of the longitudinal center of the starboard side, but no one has taken any notice of them.

The matters shown on the plat below are undisputed:

1—1. Inside lines of old piers.
2—2. Lines between which dredging was done.
3. Cluster pier, where broken-off piles were removed.

On October 22, 1926, appellants made a survey of the bottom of the river, and located various stones that fell into the water while the old starboard pier was being removed. On November 16 and 17, 1926, appellants removed, with a clam-shell crane, six stones so located. While removing those stones, a piece of cast-iron pipe, 8 inches in diameter and 12 feet long, was also taken out.

In May, 1927, the government dredge Kewanee, beginning above the bridge, dredged out a channel 40 feet wide and 150 feet long, to a depth of 22 feet below low-water datum. The dredge moved along a line 10 or 15 feet from the starboard pier. The above plat shows the line as 15 feet out from the pier. There was then removed 15 to 25 broken-off piles, some small stones, and a steel wheel some 5 or 6 feet in diameter.

There is no dispute as to the location of

the broken-off piles, nor as to their depth below the water. The evidence as to the latter, however, is very uncertain, and, although accepted as given, is evidently a mere guess. There is no dispute as to the depth of the water. There is no evidence that anything that appellants should have removed was more than 30 feet out from the face of the new starboard pier. There is some, although not much, uncertainty as to where the steamer was with reference to the starboard pier when it grounded.

The broken-off piles had been a part of a cluster of 26 piles located at the downstream end of the old starboard pier. The inner edge of the cluster extended out into the water slightly beyond the old pier, and was on a line 27 feet from the face of the new starboard pier. It is possible that some of the submerged piles were part of those that were in a line extending along the front of the old pier, but those were not out in the channel quite as far as the cluster.

Testifying concerning the cause of the list and the movement of his boat, the master of the Geer said: "I don't know what she struck. It was something hard enough to give the boat a good list. Ordinarily a mud bank would not do that."

He also said that, when he got his boat lined up, he went through the draw about 15 feet off the port pier—"that would be almost in the center." The list, he said, continued until the stern was through the bridge. If this testimony is accepted, it is quite impossible that the list was caused by the boat running upon the submerged piles. In the old channel, there was but 6½ feet on either side of the Geer at its widest point. The new port pier had been set back 8 feet. The boat, passing through 15 feet from the new port pier, would have been almost exactly in the center of the old channel, and would not have been, on its starboard side, within 6 feet of the piles. Although the master testified that he thought the piles caused the list, he also said that the "starboard side was right about the cluster piles." He said that the bow of the boat was at that time flush with the upper side of the draw and 40 feet from the starboard pier. On cross-examination, he testified that, when he said the boat was 40 feet away from the starboard pier, he meant the stem was 40 feet away, and that that was the part of the boat that was nearest that pier—an impossible position.

The first officer said that, when the Geer came to a stop, the bows had entirely entered the draw on an angle about 6 feet off of the port pier, but he could not say how far the boat was away from the starboard pier. He made a sketch that showed that the boat was then on an angle of about 40 degrees. His testimony supports the master's, to the effect that the boat, when straightened up, was 15 feet off of the port pier.

The captain of the tug did not say how close the Geer was to the starboard side, but he did say that the boat was on the mud bank.

Appellants' bridge operator testified that, when the Geer stopped, it was maybe 12 or 14 feet from the port pier, and that the stern was "kind of out in the stream."

The witness Culver, an inspector in the employ of the Soo Line, was on the starboard pier when the boat grounded. He said it was then part way through the draw, that it stood at an angle, and that the starboard side, about 80 feet back from the bows, was 20 feet out from the starboard pier.

This is substantially all of the evidence from which the location of the boat, with reference to the starboard pier, can be determined. Just where the first officer's sketch would throw the rear of the boat no one can tell, because it was not intended to be accurate either as to angle or as to distances. Although the testimony of Culver shows that, while the boat stood on an angle across the stream, it was, at a point 80 feet back of the stem, 20 feet from the starboard pier, there is no evidence to show that the boat moved along a line, as is claimed, parallel to and 20 feet from the face of the starboard pier. Such a movement, the evidence shows, would have been quite impossible, because the depth of the water, on that line, was far less than the draft of the vessel. On a line along the inner edge of the cluster piles, 27 feet from and parallel to the starboard pier, the water, on October 22, 1926, eight days after the grounding, was, right at the cluster piles, 13 feet deep. Nowhere else on that line was it more than 17 feet, 3 inches; that is, the water was from 1 to 5 feet less than the draft of the boat. On a line 10 feet nearer to the pier, and parallel with the first line, the water was from 9 feet to 11 feet 5 inches deep. That line was within 3 feet of where the starboard side of the boat would have been had it passed along a line 20 feet from the starboard pier.

The testimony of the captain of the tug shows that the boat was on the mud bank, but how far does not appear. The broken-off piles were between the starboard pier and a line parallel to and 27 feet out in the stream from that pier. The only evidence is that

the piles were from 14 to 20 feet under water, which would indicate that they were all from 1 to 4 or 5 feet below the mud bottom of the river. There would, for that reason, be hardly a possibility that the list of the boat, had it actually been over the broken-off piles, was caused by them.

There is a difficulty in the way of recovery by appellee that the evidence shows has not been overcome. The width of the boat was 26 feet on either side of the keel. All of the obstructions which the evidence shows appellants should have removed were within 30 feet of the new starboard pier, so that none of them would have been nearer than 16 feet to the keel at any time shown by the evidence. The undisputed location of the injuries to the bottom of the boat was over on the port side of the keel.

 We do not deem it necessary to deal with the question as to whether the boat was carefully navigated, as alleged, but, conceding that it was navigated with care, and that the obstructions were in the river, as admitted, that is not sufficient to justify a recovery. To justify a recovery it is necessary to show that the injuries sustained were the result of appellants' negligence. Evidence of this latter fact is not only lacking, but there is much evidence that precludes presumptions which we are asked to indulge. The 8-inch cast-iron pipe, 12 feet long, with which appellants had nothing to do, might have caused the damage. The Geer had been on the bottom repeatedly and at various times and places before October 14th. There was in the draw, where it is alleged the injuries occurred, a soft mud bottom, substantially as deep as the longest stone. All of the stones were of such a character that, in falling into the mud, they probably would not have stood on end. If they did stand on end, the boat, contacting with them, would push them over in the soft mud, that was approximately 5 feet deep, probably without doing any appreciable damage.

The evidence shows that, at times, there had been found in the bed of the river natural stones of considerable size, and that some of them had been rolled into holes dug around them. There is nothing in the evidence to exclude the possibility that there were natural stones or other obstructions than those left there by appellants in the bottom of the river at places where the boat had then recently grounded, and that could have caused the injuries.

Counsel for appellee, in oral argument, placed considerable stress upon the fact that

a sheave wheel, 5 or 6 feet in diameter, that was not discovered in appellants' survey of the mud bottom of the river, was taken out by the government dredge. They suggested that that may have caused the injury. The sheave wheel had been in the river for 8 years, and was not one of the obstructions covered by the allegation in the libel as obstructions that should have been removed by appellants. The wheel fell from the top of the old bridge 80 feet into the water at a point between the cluster piles and the old starboard pier, so that there was no possibility that it could have touched the port side of the boat's bottom at any point.

It is suggested that the cluster piles were used by the Geer to assist in making the turn into the draw, and that the navigator was misled because the cluster piles had been removed shortly before October 14th without there being placed over the spot any buoy or other marker. The sole duty of appellants was to remove the obstructions, so that, so far as affected by those obstructions, there would be clear water, navigable for its full width, between the piers. Appellants were under no duty to increase the depth in the additional width of water. The master had made, during that season, thirty or more trips through that draw, and on each of those trips necessarily passed within 10 feet or less of the port pier, that had been moved back only 8 feet—a fact that must have been well known to the master of the boat. There was no justification for him being misled because of the absence of the cluster piles.

We are of opinion that no basis for recovery is shown, and that the finding of the court should be, and it is hereby, reversed.