PIONEER STEAMSHIP COMPANY, a
corporation, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 6397.

United States District Court
E. D. Wisconsin.

Aug. 19, 1959.

**142**

Roman T. Keenen of McCreary, Hinslea & Ray, Cleveland, Ohio, Quarles, Herriott & Clemons, Milwaukee, Wis., of counsel, for plaintiff.

Edward G. Minor, U. S. Atty., Milwaukee, Wis., Howard W. Hilgendorf, Asst. U. S. Atty., Milwaukee, Wis., Thomas F. McGovern, Atty., Dept. of Justice, Washington, D. C., Charley Wyant, Chicago, Ill., F. B. Thatcher, Cleveland, Ohio, of counsel, for defendant.

GRUBB, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), for recovery for damages sustained by the S.S. Price McKinney, wholly owned by plaintiff, in the harbor at Racine, Wisconsin, on September 28, 1952, allegedly as a result of striking a submerged illegal obstruction. On trial to the court, the issue of damages was severed and reserved for later determination.

The steamship Price McKinney is a Great Lakes bulk freighter of United States registry, 432 feet in length, 52 feet in beam, and 28 feet in depth, with a gross tonnage of 4,671 and net tonnage of 3,433. At the time of the casualty, the master of the S. S. Price McKinney, Captain John C. Jessen, was in command of the vessel which was proceeding to the dock of the W. H. Pugh Coal Company on the north bank of the Root River.

The Root River is a public navigable river of the United States, extending in a west to east direction, terminating in Lake Michigan at Racine, Wisconsin. The general area where the casualty occurred may be designated as the harbor entrance channel.

The system of station marks established by the Corps of Engineers in connection with maintenance surveys is used here for purposes of placing pertinent locations and distances. (See defendant's "Exhibit 29.")

A Coast Guard Station, located on the north bank of the Root River, is the first dock in from the east end of the harbor channel entrance. The United States acquired its interest therein by a conveyance of land for use and occupancy as a Life Saving Station in 1900. The Coast Guard property extends westward from the east end of the north pier where a navigation light is located, at Station 15 + 60, to the juncture with the dock of the Coal Company at Station 18 + 50, a distance of about 290 feet. A launching slip 33 feet wide extends to the boathouse to the north of the river, at right angles to the dock, approximately 77 feet from its western end. The center of the slip is at Station 17 + 60. The remaining easterly portion of the dock is about 180 feet long. The Coast Guard dock is of sheet pile construction with a closed face, built on an original foundation of stones no larger than one man could carry.

The Coal Company dock, lying immediately west of the Coast Guard property, also runs in a generally east and west direction for approximately 1,200 feet. At the juncture of the Coast Guard and Coal Company docks, there is a slight bend or knuckle northward. The Coal Company dock is also of sheet pile construction with a closed face.

The depths of water at Racine harbor are referred to the low water datum plane for Lake Michigan which is 578.5 feet above mean tide at New York. The near-

est official water level gage station to Racine, Wisconsin, automatically reporting the water level datum, is located at Milwaukee, Wisconsin. On the date of the casualty, September 28, 1952, this station reported an average water level of 582.09 feet, or 3.6 feet above the datum plane. The average water level as Racine, Wisconsin, is substantially similar to that at Milwaukee, Wisconsin, subject to possible minor hourly variations of several inches.

The federally maintained unbuoyed channel in the Root River, opposite the Coast Guard dock, is 190 feet wide. The north channel line runs 22 feet south from the face of the Coast Guard and Coal Company docks. The latest official information available, prior to the date of the casualty, indicated that the project depth of the northern half of the channel was at 21 feet from the channel entrance to a point 400 feet upstream. The depth of the water in the 22 foot wide strip adjacent to the Coast Guard dock and between the dock and the north channel line ranged from a low of 12.3 + feet along the revetment, 16 to 18 feet at 10 feet out from the dock, and a low of 18.9 feet about 20 feet out from the dock. With a water level of 3.6 feet above datum, that amount must be added to the above-stated depths to ascertain actual depths.

In 1947, as a result of an act of God, the westerly portion of the Coast Guard dock, lying between the slip and the Coal Company dock, collapsed, thereby dumping debris consisting of stone, concrete, and steel into the Root River. Spar buoys were placed in the area off the dockline between the channel and the dock, and appropriate warnings were issued advising vessels to proceed with caution when passing the site of the revetment failure.

Reconstruction of the dock and dredging for debris were completed in January, 1949, by the Great Lakes Dredge & Dock Company under contract with defendant which required the company to remove the remaining debris. The supervision and inspection on completion of the Dredge Company's performance under the contract were undertaken by the Coast Guard. Apparently, the Corps of Engineers was not completely satisfied with the execution of the undertaking and recommended the continuation of warning buoys in the area. Further examination by sounding and sweeping operations by the Corps of Engineers revealed the presence of obstructions. After dredging in conjunction with maintenance of the channel, the buoys marking the obstruction were removed and notice was issued by defendant in its official publications that the project depth had been restored.

In October, 1951, the Lake Carriers' Association informed the Corps of Engineers of three cases where vessels had rubbed bottom at Racine Harbor on the north side of the channel just westward of the Coast Guard Station. Thereafter, special sounding and sweeping operations were conducted by the Corps of Engineers in the area from Station 16 + 50 to 20 + 50, from the revetment into the channel. No obstructions were found in the channel or projecting from the banks. The Corps of Engineers so informed the Lake Carriers' Association.

Captain Jessen, in commenting to his owners on the findings of the Corps of Engineers, indicated that he believed the obstruction to lie along the westerly end of the north pier—that is, the eastern portion of the Coast Guard dock extending to the east end of the Coal Company dock. His observation was based on his personal experience when navigating his ship about 12 to 18 feet off the pier. Sometime in 1951 the S.S. Price McKinney was involved in an incident where the vessel rubbed bottom hard or grounded without official report of the incident. The information contained in the Captain's comments to his owners was not made available to the government prior to the 1952 casualty.

Most ships discharging coal at the Coal Company dock turn in the outer basin of the harbor and back up river with the customary gratuitous assistance of the Coast Guard personnel in bringing

ashore and fastening lines to pull the stern of the vessel westward and into a position parallel with the dock. Whenever any ship executed this maneuver, it was also customary for the Coast Guard to swing in the boat davits located on the west end of the pier and otherwise extending over the water. The S.S. Price McKinney had on numerous prior occasions entered the harbor channel in this manner when water levels and the vessel's draft were similar to those on the date of the casualty without incident except for the occurrence in 1951 and the casualty in question.

On September 28, 1952, in the early afternoon, the S.S. Price McKinney entered the harbor at Racine, Wisconsin. The vessel had a draft of 18 feet 9 inches forward, 19 feet 2 inches midships, and 19 feet 6 inches aft. The weather was fair with a southwest wind. The vessel followed the customary maneuvers in proceeding toward her destination with Coast Guard assistance. After the vessel was in a parallel position to the Coast Guard dock, she commenced to proceed stern first very slowly toward the Coal Company dock. While thus backing up the river, the S.S. Price McKinney struck a submerged obstruction.

The evidence as to the exact location of the vessel at the time of the grounding is uncertain and conflicting. On the trial, Captain Jessen placed her at from 20 to 30 feet from the dock with the boiler-house, which is about 50 feet forward of the rudder post, abreast the slip and with the rudder post abreast the west end of the slip or the east end of the west portion of the dock.

The first mate, McIver, whose duty it was to inform the master of the location of the vessel in relation to the dock line and who was stationed just forward of the boilerhouse, estimated the distance from the dock at 24 to 36 feet.

Another eyewitness, the officer in command of the Coast Guard Station on that date who was standing in front of the Coast Guard Station at the time, observed the vessel's position as from 5 to 10 feet from the dock with the midship

about opposite the slip. This officer appears not to have been aware that the vessel grounded until he was so informed by the Captain after docking.

There is general agreement that the ship was in a position parallel to the Coast Guard dock with the bow angled slightly to the south. It has been stipulated that her stern finally came to within at least 6 feet of the knuckle at the juncture of the Coast Guard and Coal Company docks.

On striking, the vessel listed to starboard, and a rumbling noise was heard as though she were going over stone. The engine was stopped and reversed, and the lines were slackened. However, the attempt to go forward was unsuccessful. By use of the propeller and the winch engine pulling on the cables, the S.S. Price McKinney backed over the obstruction, was freed, backed to the Coal Company dock, and was pulled alongside at 3:15 P.M.

Immediately after docking, Captain Jessen reported the striking to the commander of the Coast Guard Station and informed the Corps of Engineers thereof on the following day, Monday, by telephone from Chicago.

Notes taken by Lieutenant Commander Turner during the official Coast Guard investigation of the striking early in October, 1952, at Toledo, Ohio, aboard the S.S. Price McKinney, indicated that Captain Jessen had difficulty in that the wind caused him to set heavily against the dock at the time of the casualty. On the trial the Captain did not recall having made this statement. Turner, for purposes of the report, concluded that there was no indication of any violation of the applicable rules or regulations or of any negligence or inattention to duty on the part of the master.

Subsequent investigation in drydock revealed major damage sustained by the S.S. Price McKinney's bottom on the port side, on E strake, located just inboard of the turn of the bilge, 2½ feet from the side, beginning at Frame 124, located approximately 92 feet forward of the

rudder post and running for a length of more than 300 feet in a direction parallel to the side of the boat. The major damage was from 30 to 36 inches in width, the bottom plates being set in and heavily scored or gouged. Minor damage about 50 feet long was sustained by C strake, about 12½ feet from the side of the vessel but considerably further front.

After the casualty, the Coast Guard issued appropriate warnings to mariners to avoid the area until it could be cleared. In October, 1952, the Corps of Engineers conducted special sweepings and soundings in the area of the Coast Guard dock which revealed the presence of stone and rock debris from Station 17 + 35 to 18 + 52, mostly landward of the channel, except for some stone or rock debris at Station 18 + 28, and 17 + 80 to 17 + 46 in the channel, with indications of rock located below the depth of 16.5 feet.

In December, 1952, the Corps of Engineers conducted dredging operations in the area from Station 17 + 35 to 19 + 00. A number of objects were removed during the operation, including the following pieces at the locations stated:

A 12 inch x 30 foot bent channel iron at Station 17 + 50, 30 feet out from the revetment at an undisclosed depth; a chunk of reinforced concrete from the old retaining wall of the collapsed Coast Guard dock, 6 x 4 x 5 feet in "L" shaped form, at Station 17 + 60, about 30 feet from the revetment at an undisclosed depth; 20 feet of bent 2 inch pipe; and a reinforced concrete chunk, 6 feet long, at Station 17 + 80 at 10 feet from the revetment, also at an undisclosed depth. Further dredging operations in June of 1953 resulted in the removal of additional debris.

The vessel was sounded by the Captain after the grounding and further examined by a marine surveyor at Toledo, Ohio, on October 7, 1952, who recommended drydocking at the earliest convenience. The surveyor testified that the S.S. Price McKinney sustained damage, showing evidence of rust and newness of character, resulting from striking a hard rock or hard object as evidenced by the sharp scoring or gouging out of practically 50 per cent of the thickness of the plates. In the surveyor's uncontradicted opinion, the damage could not have been sustained by striking a dock or vertical structure in the water.

Based on the voluminous record of the evidence adduced on the trial and as set forth in the briefs and proposed findings of fact submitted by the parties, the court finds that the S.S. Price McKinney sustained damage by striking debris resulting from the collapse of the Coast Guard dock located in the navigable waters in the vicinity of the dock.

█ The position of the vessel and the precise location of the debris causing the injury at the time of striking cannot be ascertained with mathematical certainty in view of the uncertain and, in part, conflicting evidence on this question. The testimony on this point must be weighed in light of the loyalty of the officers of the ship to the vessel and of the Coast Guard officer to his service. Greater weight may be accorded the testimony of the men on the injured vessel than that of observers unaware of the casualty. See Kelley Island Lime & Transport Co. v. City of Cleveland, D.C. N.D.Ohio 1942, 47 F.Supp. 533, at page 542.

Based on the testimony of the eyewitnesses, on the agreed fact that the vessel came to within at least 6 feet of the knuckle at the juncture of the Coast Guard and Coal Company docks, on the uncontroverted position of the vessel as parallel to the dock with the bow slightly angled to the south, and on the evidence as to the position of the vessel on prior voyages up the river, including the Captain's report of the 1951 incident, the court finds that the vessel, at the time of the striking, was along and somewhat landward of the northern channel limit and that its stern, that is, the rudder post, was approximately opposite the east end of the western portion of the Coast Guard revetment with the boilerhouse about opposite the Coast Guard slip. From this position of the vessel and in light of the site of the injury to the ves-

sel's bottom, it follows that the objects struck by the vessel were located along the northern channel limit and somewhat landward thereof, approximately in the vicinity of Station 17 + 00, at the time of the casualty.

While the failure of the dock occurred in the portion west of the slip, the presence of debris to the east thereof may be accounted for by action of ice formations in the river which, in the opinion of the government's expert witness, were capable of moving large particles, as well as by the movements of vessels and actions of dredges in the area which may have undermined the sloping embankment, causing the objects to change position.

█ The presence of these objects on dredging subsequent to the casualty at a location west and channelward of their probable location at the time of the striking does not of necessity give rise to an inference running backward that these objects had always been located at the site where the dredge found them after the casualty, particularly since their presence at that location had not been revealed by the special sweeping and sounding operations in this area in October, 1951. See Russell, Poling & Co. v. Conners Standard Marine Corp., 2 Cir., 1958, 252 F.2d 167.

Several of the objects subsequently dredged within a radius of 50 to 60 feet of the probable site of the striking and generally along the path followed by the vessel in riding over and freeing herself of the obstruction were capable of inflicting damage as determined by the marine surveyor. Natural obstructions legally present in this vicinity, such as mudbanks and foundation stones, were not shown to have this capacity.

While reported water depths at the time of the casualty should have permitted a vessel, having the drafts of the S.S. McKinney as of that date, to traverse the area in the channel and almost to within 10 feet of the dock with safety, navigability in fact does not depend upon reported depths but rather on the existence of clear, unobstructed water at such depths.

Defendant's theory that the debris could not have caused the injury, based on mathematical computations, does not establish the theory as an evidentiary fact where certain factors on which the computations were based, such as a definite location of the vessel, the assumption that submerged obstructions do not change their location, and the reliability of prior sweeping and sounding as revealing the presence of submerged obstructions, were uncertain and disputed. The case of Wisconsin Cent. Ry. Co. v. Reis S.S. Co., 7 Cir., 1930, 45 F.2d 366, may be distinguished since there the objects in question were in part stationary, and the location of the vessel in relation to the objects was established with a degree of certainty.

While defendant did not create the hazardous condition by its own act, it undertook by acts of its agents and its contractors, performing nondelegable duties, to issue warnings in respect thereto and to effect its removal. Thereafter, defendant held out to mariners, including plaintiff, by its official publications and by rescinding its previously posted warnings in the area that the waters in the vicinity of the Coast Guard dock were free of illegal obstruction and navigable subject to stated depths.

Defendant failed to exercise due care in the performance of these acts. Defendant knew, or in the exercise of ordinary care should have known, that the removal of part of the debris by the Great Lakes Dredge & Dock Company did not clear the area in the vicinity of its dock of all debris. Subsequent sweepings and soundings revealed the continued presence thereof.

█ Although no testimony showed that subsequent operations by the Corps of Engineers in dredging in connection with the channel clearance and in sweeping and sounding were performed in an improper manner, the government knew, or should have known, that sweeping and sounding will not necessarily reveal obstructions not protruding from the

river bottom, and that such submerged obstructions, especially where located on the embankment landward of the channel, might become dislodged or moved from their covered position and become hazards to navigation, either by maneuvers of vessels in that area or by natural causes. Having actual or constructive notice that the original attempted removal of the debris was faulty, defendant was negligent in failing to employ proper means such as probing, boring, or using a diver to ascertain the location of the remaining debris. Failure to discover by sweeping does not prove the nonexistence of the obstruction. Gulf Oil Corp. v. Dredge Baltimore, D.C. E.D.N.Y.1942, 47 F.Supp. 770, 1942 A.M. C. 1239.

■ The discovery of a 4 to 5 ton chunk of concrete among other large amounts of debris from the Coast Guard dock in the area previously dredged and examined is persuasive evidence of the inadequacy of prior removal and examination regardless of the professional competency with which these acts may have been performed. See Kelley Island Lime & Transport Co. v. City of Cleveland, D. C.N.D.Ohio 1942, 47 F.Supp. 533, at page 541, citing The Thomas Cranage, D.C. W.D.N.Y.1911, 189 F. 1003.

When defendant received further notice of possible obstructions due to the debris remaining from the collapse of the Coast Guard dock in the area west of the slip by the information that vessels had rubbed bottom in that area which defendant held out to be navigable subject only to stated depths, it was put on inquiry notice whether or not it had failed in its previously assumed duties of removal, inspection, and warning. Thereafter, defendant did not do all things reasonable to assure that its holding out of navigability of the area, based on its attempted removal and rescinding of warning, did not constitute a trap to mariners. Defendant failed to exercise reasonable care when it did not ascertain the location of this possible hazard with any degree of certitude by further inquiry of the vessels in question and when

it did not employ appropriate means to determine the potential existence thereof. See Eastern Transp. Co. v. United States, D.C.E.D.Va.1928, 29 F.2d 588, affirmed The Snug Harbor, 4 Cir., 1930, 40 F.2d 27.

■ Where the original presence of the obstruction was within the knowledge of the defendant who received further notice of its probable presence in the area, the condition may be distinguished from a latent inherent condition of which defendant had no notice. While normal precautions taken to see that a discoverable condition did not exist may be sufficient to avoid liability in respect to an unknown, latent condition (see Peter Paul, Inc. v. Rederi A/B Pulp, 2 Cir., 1958, 258 F.2d 901, certiorari denied 359 U.S. 910, 79 S.Ct. 586, 3 L.Ed.2d 574), defendant's responsibility with respect to obstructions it knew or should have known existed in waters it held out to be navigable requires more than searching for such obstructions with means not designed to reveal their potentially hazardous location.

■■ Plaintiff was not negligent in its maneuvers while proceeding to the dock of the Coal Company. Its right to navigate the full reach of navigable waters, including those landward of the federally maintained, unbuoyed channel, subject to natural obstructions such as foundation stones and mudbanks, is well established. Casement v. Brown, 1893, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582; Corby v. Ramsdell, 2 Cir., 1931, 48 F.2d 701. See also Lehigh Valley Railroad Co. v. The Russel No. 1, D.C.E.D.N.Y.1958, 163 F.Supp. 459, where tug owner who was liable to the tow for damages sustained while navigating outside the channel could look to the City of New York for indemnity on the ground of the city's liability in respect to the hazardous condition existing outside the channel.

■ Plaintiff did not fail to exercise due care in approaching its intended destination where it was shown that it followed the course and manner usually pursued by it and by other vessels bound

for the Coal Company dock. Since the davits which customarily were swung in by the Coast Guard personnel on the approach of the S.S. Price McKinney were removed from their position over the water on the approach of any vessel, it appears that other vessels bound for this destination also navigated landward of the channel and close to the Coast Guard dock.

No evidence established that the acts of the master of the vessel in attempting to free his ship after the striking increased the damage or that there was a better and safer conduct that ought to have been observed. Furthermore, there was a finding on the official Coast Guard investigation of the casualty in question here that there was no evidence of negligence or inattention to duty on the part of the master.

■ Plaintiff failed to exercise due care in navigating in an area where it had actual notice of the existence of a navigational hazard, which notice it obtained from its own experience in the area in 1951, within one year prior to the date of the casualty, and where it believed that the area subsequently examined was not that where it had encountered the obstruction. See Corby v. Ramsdell, 2 Cir., 1931, 48 F.2d 701, and The No. 4, D.C.S.D.N.Y.1928, 27 F.2d 442.

■ Where damage to a vessel is occasioned by the striking of an illegal obstruction in the navigable waters of the United States, the basis of the action is a maritime tort. Under the Federal Tort Claims Act, the law of the place applicable to maritime torts is the federal maritime law unaffected by the remedy. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

■ While Wisconsin does not appear to have ruled on this question, other jurisdictions have decided that the courts of the State where the action was brought would apply substantive admiralty principles. Moran v. United States, D.C.D.Conn.1951, 102 F.Supp. 275; Russell, Poling & Co. v. United States, D.C. S.D.N.Y.1956, 140 F.Supp. 890; Somerset Seafood Co. v. United States, 4 Cir., 1951, 193 F.2d 631. Under the common law of most, if not all, of these jurisdictions, unlike maritime law and the comparative negligence statute of Wisconsin, contributory negligence would have been a bar to recovery.

■ In a maritime tort, as in any other tort, plaintiff must show the physical cause of his injuries, fault on the part of the defendant sought to be held responsible, and a causal connection between such fault and the physical cause resulting in injury to the plaintiff. The YFNX–6, D.C.D.Md.1957, 156 F.Supp. 325, affirmed Gosnell v. United States, 4 Cir., 1959, 262 F.2d 559.

■ In respect to the physical cause of the injury, plaintiff has met its burden by showing by a fair preponderance of the evidence that one or several of the large objects among the debris from the Coast Guard dock, located along the channel line and landward of the channel, were a more probable cause than any other of damage to the vessel. The YFNX–6, supra.

■ When defendant undertook to warn mariners of the hazard to navigation created by the presence of debris in the navigable waters in the vicinity of the Coast Guard dock and to remove said hazardous condition, it assumed a duty not to perform these acts in a negligent manner, regardless whether or not it undertook the performance thereof in its capacity as the owner of the property or in pursuance of its official Coast Guard duties under Section 86, "Marking of Obstructions," of Title 14 U.S.C.A. Somerset Seafood Co. v. United States, 4 Cir., 1951, 193 F.2d 631; Indian Towing Co. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48.

■ Where defendant knew that mariners, including plaintiff, would rely on its holding out that the navigable waters where the casualty occurred were clear of illegal obstructions, defendant's negligent acts and omissions in respect to such holding out by its official publica-

tions and by rescinding its warnings after inadequate inspection and removal were the proximate cause in bringing about the injury to plaintiff's vessel occasioned by striking debris from the Coast Guard dock located in said navigable waters. Somerset Seafood Co. v. United States, supra.

■ Plaintiff's negligence in navigating in waters known to it to be dangerous concurred with the negligence of the defendant in bringing about the injury to its vessel, warranting division of damages. Corby v. Ramsdell, 2 Cir., 1931, 48 F.2d 701; Somerset Seafood Co. v. United States, supra; Thomson v. United States, 4 Cir., 1959, 266 F.2d 852.

### Findings of Fact

1. This court has jurisdiction of this action under the provisions of the Federal Tort Claims Act.

2. The defendant was negligent in the performance of its duty to remove all of the debris from the collapsed Coast Guard dock and was also negligent in failing to warn mariners of the presence of the remaining debris.

3. The foregoing negligence on the part of the defendant was causal so far as the injuries to the S.S. Price McKinney were concerned.

4. The master of the S.S. Price McKinney was negligent in navigating at the place he did after having struck an obstruction there a year previous.

5. The master's negligence was also causal.

### Conclusions of Law

1. The damage to the vessel was occasioned by a maritime tort on the part of the defendant.

2. The law of Wisconsin is applicable since Wisconsin was the place of the injury.

3. Under the law of the State of Wisconsin, substantive admiralty principles must be applied.

4. The defendant is liable to the plaintiff, but there must be a division of damages under the admiralty rule because of plaintiff's concurring negligence.

The parties are to have thirty days within which to agree on the amount of the damages in this action. If no agreement can be reached within that time, the issue will be referred to commissioners in accordance with Rule 43 of the Admiralty Rules, Title 28 U.S.C.A.

Plaintiff is hereby directed to prepare an order in accordance with this decision and to submit said order to defendant for approval as to form only.