**George CAULEY**

v.

**The UNITED STATES of America.**

Civ. No. 753.

United States District Court
E. D. North Carolina,
Wilson Division.

June 29, 1965.

Thos. J. White, of White & Aycock, Kinston, N. C., Cicero P. Yow, of Yow & Yow, Wilmington, N. C., for plaintiff.

Robert H. Cowen, U. S. Atty., by Gerald L. Bass, Asst. U. S. Atty., for defendant.

LARKINS, District Judge:

## SUMMARY

This is an interesting story about fish and illicit distilleries.

This cause comes before the Court without a jury by a citizen and resident of the United States, State of North Carolina, and County of Wayne, against the United States, pursuant to the provisions of the Federal Tort Claims Act, Title 28 U.S.C.A. § 1346(b), as amended.

Plaintiff asserts that employees of the Treasury Department attached to the Alcohol and Tobacco Tax Unit destroyed by means of dynamite an illicit distillery and related containers of mash or fermenters containing 7,200 gallons of fermenting mash while acting within the scope and course of their employment as agents and servants of the United States. Plaintiff alleges that as a result of the

destruction of the fermenters, the mash therein flowed by means of a ditch, stream and canal into a fish pond constructed and controlled by plaintiff, the pond being some three-fourths of a mile from the distillery site.

The pond was located on lands controlled by plaintiff but not owned by him, the fee simple title being in another. Plaintiff alleges that as a direct result of this flow of mash, the value of the pond has been materially decreased due to the destruction of all the fish in it.

## FINDINGS OF FACT

The unregistered distillery in question had a daily producing capacity of 352 gallons of whiskey. At the time of the raid upon this distillery, there were 7,200 gallons of fermenting mash contained in fermenters. It takes approximately ten gallons of fermenting mash to produce one gallon of whiskey.

The total capacity of all the mash fermenters at the still site was 8,800 gallons, but all were not being fully used. Considering the operating capacity of the distillery to be 352 gallons of whiskey per day, and considering the ten to one ratio of need for mash to produce whiskey, a total of 3,520 gallons of mash could be used each day at the still site whenever the distillery was operating at maximum capacity. This used or spent mash, which is not suitable for fermentation purposes, would have to be disposed of in some manner.

In this respect, it is in evidence that this illicit distillery was in use for approximately three weeks prior to the time of the raid on it and the resultant release of the 7,200 gallons of fermenting mash. Simple mathematics indicate that a considerable quantity of spent mash must have been released prior to the time of the destruction of the distillery and the release of the fermenting mash.

To dispose of this spent mash the distillery operators had to wash it away by putting it into running waters. The only source of running water was that which also entered the fish pond. The distillery site had as its source of water two streams passing on each side of the still yard. These two streams joined together and then passed under an unpaved road, whereupon they fed into a canal. This canal, in turn, was the source of water for plaintiff's pond.

The distillery site was actually drained by a small shovel width ditch which was dug from the still yard to the streams. It can be seen, then, that the mash would flow from the site by means of the ditch into the streams and then on its way via the canal into the pond which was located three-fourths of a mile away.

Plaintiff's pond encompasses 2.63 acres and averages two and one-half feet in depth. In August 1959, it was stocked with bass and blue gill type fish which had been growing in the pond for the preceding eight years. These fish were reaching the size considered large enough for harvesting.

It is in evidence that the month of August 1959 was a dry month and that there was only a small quantity of water flowing from the streams' beds into the canal. The distillery ditch was dry unless supplied from the still site. It also appears that the plaintiff's fish were dying on the day of August 16, 1959, and this is the earliest possible day that evidence indicates the distillery could have been destroyed and the fermenting mash released. It is also in evidence that the distillery was not destroyed until August 20, 1959.

Prior to the setting off of the dynamite charges which ruptured the mash fermenters, an inspection of the surrounding topography was made by some of the A. and T. T. agents present. They determined that a destruction of the distillery apparatus and the fermenters by dynamite would be safe in that the ground was level and the area remote. The site was located in a wooded, rural area with no structures or residences within three-fourths of a mile of the site. The dynamite charges dispersed the fermented mash over a wide area into trees and over the ground, but it is entirely possible that some of it flowed into the ditch which ran from the still site and

into the streams. The water level being low, and the terrain being level, it would have taken some time for the mash released by the dynamite charges to reach the pond, the amount of time it would have taken not being in evidence. It appears from the evidence that most, if not all, the fish in plaintiff's pond were dead by August 18, 1959.

It also appears in evidence, by means of an analysis of the water in the pond, that the mash in the pond was spent mash because it lacked a sugar and starch content requisite in fermenting mash. Further evidence, all by means of experts, indicates that spent and fermenting mash would be equally destructive to fish life in the pond waters, this being so because the nature of mash is such as to consume the oxygen in solution contained in the pond waters.

According to this expert testimony, in a pond of the size and condition as plaintiff's, the maximum amount of oxygen in solution in the pond would be equivalent to 140 pounds. A mash solution, be it spent or fermenting, of a quantity of only 700 gallons would readily and rapidly consume that quantity of oxygen in solution which would be contained in a pond of the sort in controversy, thereby causing the fish in the pond to suffocate.

In examining the evidence, then, it is apparent that spent mash was the most obvious cause of the loss of fish life in plaintiff's pond. It also appears that the operators of the illicit distillery would be the persons most likely responsible for introducing spent mash into the streams which carried the mash, in turn, into plaintiff's pond. This conclusion is deduced from the evidence as set forth above, including the fact that the A. and T. T. agents released fermenting mash, that fish were seen dying on the 16th day of August, 1959, the earliest possible date of the destruction of the fermenters, and that a later date is possibly the date the distillery was actually destroyed.

■ It is readily possible to conclude that the cause of the damage to plaintiff's pond was created by the operators of the illicit distillery, and that any action taken by the defendants was not the proximate cause of the damage complained of. This conclusion bears a weight at least equal to a conclusion that the action of the defendant, through its agents, was the cause of the mash entering plaintiff's pond. This Court is not willing to speculate further in plaintiff's behalf in order to find facts in his favor.

## CONCLUSIONS OF LAW

■ In an action by a person in possession of real property against the Government for damages caused by the alleged negligence of employees of the Government in failing to exercise due care in the dynamiting of an unregistered distillery, the burden is upon the person in possession of the property to show there was a breach of the duty to exercise due care, and that the breach of duty by the Government was a cause in fact of the plaintiff's loss. Arnhold v. United States, 284 F.2d 326 (9th Cir., 1960); and People of State of California v. United States, 307 F.2d 941 (9th Cir., 1962).

■ When an action is brought under Title 28 U.S.C.A. § 1346(b) (hereinafter referred to as "subsection (b)"), and the Government denies the act of negligence, the burden is upon the plaintiff to prove that negligence of the Government, or that negligence imputable to the Government, was a proximate cause of the injury and damage complained of. Ray v. United States, 228 F.2d 574 (5th Cir., 1955); and Libby v. United States, 209 F.Supp. 793 (E.D., Mich., 1962).

■ From the facts set out above, it can be seen that the proximate cause of plaintiff's damages was, in all likelihood, the conduct of the operators of the illicit distillery. At any rate, plaintiff has not shown by a preponderance of the evidence that the conduct of the agents of the Government was the proximate cause of the damages. Ordinarily, liability will not attach for the acts of a third person unless such acts were reasonably foreseeable by the defendant to be neg-

ligent at the time of this third parties' conduct. This principle is applicable to suits brought under subsection (b). Blitz v. Boog, 328 F.2d 596 (2nd Cir., 1964).

 Questions of fact such as to whom the blame for the release of the mash into streams can be laid are for the Court to determine in this case, it being tried without a jury. United States v. Hunsucker, 314 F.2d 98 (9th Cir., 1962); Swanson v. United States, 229 F.Supp. 217 (N.D., Cal., 1964). In resolving these questions of fact, the Court is entitled to draw reasonable inferences from the facts as presented, and it has done so. Pioneer S. S. Co. v. United States, 176 F.Supp. 140 (E.D., Wis., 1959). And no special presumption arises against the Government merely because it is dealing with an unusual or dangerous commodity. Porter v. United States, 128 F.Supp. 590 (E.D., S.C., 1955); and Villarreal v. United States, 254 F.2d 595 (5th Cir., 1958). The burden of proof remains with the plaintiff and he has failed to carry it.

This Court recognizes that if the Government failed to exercise reasonable care in respect to its control and supervision of the destruction of the fermenters, and if this failure concurred with the negligence of the operators of the distillery in proximately causing plaintiff's damages, such a result may warrant a division of damages. Pioneer S. S. Co. v. United States, 176 F.Supp. 140, supra. But plaintiff has failed to establish this.

Plaintiff has actually failed in two respects in this case. (1) He has not shown that the Government failed to exercise reasonable care and supervision in the destruction of the fermenters; and (2) that the released fermenting mash caused any of the complained damages.

It can then be said that in an action lying in tort against the United States for alleged negligence, both negligence and causation must be proved according to the principles requiring a plaintiff's burden of proof in any tort action arising in North Carolina. Mahoney v. United States, 216 F.Supp. 523 (E.D., Tenn., 1962); rehearing in 220 F.Supp. 823 (E.D., Tenn., 1963); and Jackson v. Neill McKay Gin Co., 255 N.C. 194, 120 S.E.2d 540 (1961).

## ORDER

Therefore, it is ordered that, upon a determination of the factual issues before the Court, this action being determined on its merits, plaintiff's prayer for relief be, and the same is hereby denied.