**J. S. FINKEL, Plaintiff,**

v.

**CHALLENGER MARINE CORP., a Florida corporation, and Chris Craft Industries, Inc., a Delaware corporation, Defendants.**

**Civ. No. 69–1192.**

United States District Court, S. D. Florida.

Aug. 10, 1970.

Smathers & Thompson, Lane & Mitchell, Miami, Fla., for plaintiff, J. S. Finkel.

Dixon, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for defendant, Challenger Marine Corp.

Scott, McCarthy, Steel, Hector & Davis, Miami, Fla., for defendant Chris Craft Industries, Inc.

## MEMORANDUM OPINION

FULTON, Chief Judge.

This cause was tried to the Court without a jury. After having heard the testimony offered by the parties, and having considered all of the evidence and memoranda submitted on behalf of the respective parties, the Court makes and enters this Memorandum Opinion as its Findings of Fact and Conclusions of Law.

### Jurisdiction

Initially, this suit was brought by the plaintiff against both the manufacturer and retailer of a 57 foot yacht, the cabin of which was customized to suit the particular desires of the plaintiff. Chris Craft Industries, Inc. was the manufacturer of the yacht and Challenger Marine Corp. was the retailer. Hereinafter, these defendants will be referred to as Chris Craft and Challenger. The contract for the sale and purchase of the vessel, including modifications to the decor of the cabin, was mutually executed and delivered in Florida. As hereinafter further explained, Challenger contracted with the plaintiff to deliver the vessel to the plaintiff at Bimini in the Bahama Islands, so that the payment of sales tax to the State of Florida could thereby be avoided.

In his complaint, the plaintiff sought damages from both Chris Craft and Challenger, claiming a right of recovery for negligence and/or breach of contract. The complaint alleges and the proof shows that, during the crossing from Miami to Bimini, furniture was permitted to ricochet around in the cabin, scratching, scuffing and nicking the paneling; and that after the vessel reached Bimini, but before delivery to the plaintiff, the vessel was grounded on a bar in the Bimini Harbor. The plaintiff claims negligence on the part of the defendants in connection with the crossing from Miami to Bimini and that the defendants breached a contract whereby the vessel was to be delivered to the plaintiff in Bimini in "new condition."

The parties to this cause entered into a Pretrial Stipulation in which it was stipulated that this cause is within the admiralty and maritime jurisdiction of this Court. The plaintiff now contends that his claim against the defendant Challenger is civil in nature; and that he is, therefore, entitled to recover damages flowing from a simple breach of a contract to furnish the plaintiff with a yacht in new order and condition. Challenger contends that plaintiff's claim, if any, is maritime in nature, based upon a tortious breach of contract arising out of a maritime transaction.

The plaintiff has made no claim against either defendant for negligent manufacture of the yacht in question. Hence, there is no issue of whether the yacht was manufactured in a good and workmanlike manner, or whether the yacht sold by the defendant Challenger to the plaintiff was in fact the yacht that the plaintiff had purchased. The wrongful conduct charged by the pleadings pertains to the crossing made by the yacht from Miami to Bimini, and her subsequent grounding in that harbor. It is, therefore, the conclusion of this Court that this action is maritime in nature rather than civil, and that any civil issues are pendant to the admiralty jurisdiction of this Court. Berwind-White Coal Mining Co. v. City of New York (C.A. 2, 1943), 135 F.2d 443; Admiralty Jurisdiction and Ship Sale Contracts, 6 Stanford L.Rev. 540 (1954).

At the outset of the trial, the plaintiff and the defendant Chris Craft entered into a stipulation for the dismissal of the plaintiff's suit against Chris Craft with prejudice. The stipulation was reduced to writing and filed with the Court. In that stipulation, the plaintiff agrees that he has no claim against Chris Craft for damages, negligence or

breach of contract arising out of the grounding of the yacht at Bimini. The Court recognized and approved that stipulation and entered an order whereby this cause was dismissed as to the defendant Chris Craft with prejudice to the plaintiff and at the cost of the respective parties.

### Liability

 The plaintiff desired to purchase a 57 foot Chris Craft Constellation yacht for personal pleasure purposes. He had owned pleasure craft of varying sizes for some 17 years. He visited the Chris Craft factory at Pompano Beach, Florida, where he observed a hull of such a yacht in the production process. Upon inquiry, he learned that this was being constructed for Challenger, a distributor of Chris Craft products located in North Miami, Florida. The plaintiff thereupon contacted Challenger and began to negotiate with its sales manager, Ray Grissom.

The plaintiff indicated to Grissom that he desired to have certain alterations and changes made to the cabin of the vessel, primarily in the nature of a customized or special decor. The plaintiff and Grissom went again to the Chris Craft factory where they discussed the feasibility and cost of these proposed changes with representatives of the Chris Craft company. As a result of these discussions, an agreed price of $117,144.50 was reached between the plaintiff and Challenger for the purchase of the vessel, altered as desired by the plaintiff. In addition, it was agreed between the plaintiff and Challenger that the vessel would be delivered to the plaintiff in Bimini, Bahama Islands, so as to attempt to avoid the payment of the Florida State Sales tax upon the transaction. The parties are in dispute as to who suggested this device. The defendant Challenger made no special charge to the plaintiff for this delivery. Plaintiff did agree to reimburse Grissom and/or Challenger for personal expenses incurred in this delivery, including plane fare and governmental fees for Grissom's return from Bimini to Miami.

The yacht was delivered by Chris Craft to Challenger on or about March 15, 1969. On March 17, 1969, the plaintiff paid Challenger in full for the agreed sales price of the yacht. On March 18, 1969, Challenger issued a Bill of Sale to plaintiff. Shortly thereafter plaintiff executed a document on a form provided by the Treasury Department, Bureau of Customs, entitled "Oaths on Registry, License, or Enrollment and License of Vessel" in which he stated under oath that he was then the sole owner of the yacht. This oath was filed with the Bureau of Customs, after which a temporary private yacht license was issued to the yacht. Hence, title to the yacht passed from the defendant to the plaintiff on March 18, 1969.

At this point in time, the yacht was in the water at the premises of Challenger, in North Miami, Florida, when the yacht was delivered by Chris Craft to Challenger, it required certain minor alterations and changes that had to be made in order for the vessel to be fully outfitted and equipped as ordered by the plaintiff. In addition, there were certain "extras" that the plaintiff had ordered from Challenger which had to be installed by Challenger and for which the plaintiff was billed separately. The "extras" were not a part of the basic purchase price of the yacht. While this remaining work was being completed, the plaintiff's Captain was given the keys to the cabin doors of the yacht and he moved his personal possessions, and those belonging to the plaintiff and his wife, aboard the vessel.

It is not necessary for the Court to here decide where and when constructive delivery of the yacht took place. However, if such issue required resolution, the Court would hold that constructive delivery of the yacht took place in North Miami, Florida, at the premises of the defendant Challenger when title was transferred to the plaintiff and when the plaintiff, through his Captain, began to exercise dominion over the yacht.

The plaintiff was notified that the remaining work would be completed by April 25, 1969. On that morning, the plaintiff went to the premises of Challenger, where he paid the bill due to Challenger for the "extras."

On that day, after some delay occasioned by a misunderstanding regarding the validity of a check which the plaintiff had tendered in part payment of the remaining balance, the plaintiff, together with his wife and his Captain, set out for Bimini aboard another yacht owned and operated by plaintiff's friend. Somewhat later on the same day, plaintiff's yacht also set out for Bimini, with Grissom at the helm and another Challenger employee acting as mate.

Dudley Whitman, then President of Challenger, testified that on several occasions on the morning of April 25, 1969, prior to the departure of the yacht from Miami bound for Bimini, plaintiff was warned that the weather was not favorable for the crossing and that rough weather could be anticipated. Whitman testified that despite such warnings plaintiff insisted that the crossing be made that day. The yacht did encounter heavy weather between Miami and Bimini. As a result, certain furniture in the interior of the vessel moved about causing damage to furnishings and paneling in the nature of nicks, dents and scratches. Although plaintiff disputed the condition of the weather encountered on the crossing, the Court finds that the testimony of Grissom is entirely credible, both as to this fact and as to the other facts to which he testified at the trial.

Upon arrival in Bimini Harbor on the evening of April 25, 1969, Grissom deemed it unadvisable to attempt to bring the yacht to a designated dock because of the condition of the weather. He elected to anchor the yacht in the harbor for the night. The following morning when the weather had subsided, Grissom and his mate undertook to bring the yacht to the dock. In the process of raising the anchor, by means of an electric winch, a circuit breaker went out, causing the vessel to momentarily lose power. As a result, the yacht drifted astern and went aground on a sand bar. But the vessel was ultimately refloated by the tide and proceeded to the dock. The plaintiff and Whitman agreed that since the nature or extent of the damage, if any, could not be ascertained in Bimini that the yacht should be returned by Grissom to Miami and there hauled and examined for damage.

Upon its return to Miami, the yacht was hauled and surveyed by surveyors representing both parties. As a result of this survey, certain recommendations were made concerning the repair of some of the underwater structures of the yacht and the various nicks and scratches in the cabin and upon the hull. The cost of the recommended repair of the underwater damage resulting from the grounding was $1,802. The cost of refinishing the scuffs and scratches in the cabin and upon the hull, resulting from the rough crossing, was $1,975. The total cost of repairs, including sales tax, was $3,938.08. This sum was paid to the plaintiff by Atlantic Mutual Insurance Company, with which company the plaintiff had earlier caused his yacht to be insured. That company is subrogated to the claim of the plaintiff to that extent.

While the vessel was drydocked for these repairs, plaintiff secured the ignition keys from the defendant Challenger. He also caused the vessel to be completely scraped and refinished in a gloss finish different from the finish applied by the manufacturer. This cost approximately $1,600. This work was not necessitated by any action on the part of Challenger and constituted a betterment in the condition of the yacht, or was in the nature of ordinary maintenance.

While Challenger realized no direct financial benefit from the attempted delivery of the yacht in Bimini, nevertheless, it agreed to do so as a separate and special undertaking. No date or time of performance of this undertaking was specified. Consequently, the defendant was not legally obligated to attempt to take the yacht to Bimini on the date in

question in the face of adverse weather conditions, although as a practical matter, Challenger may have been under heavy pressure from the plaintiff to do so. Challenger was negligent in attempting to make the crossing under the circumstances described by the witnesses. Grissom and the mate were employees of the defendant and were acting within the scope of their employment in making the attempted delivery in Bimini. The Court further finds that Grissom was negligent in the handling of the yacht in Bimini Harbor and as a direct and proximate result of that negligence the yacht became stranded. The Court therefore finds that Challenger is liable to the plaintiff for the damages he sustained as a result of the rough crossing to Bimini and the stranding in Bimini Harbor.

### Damages

As noted in the preceding section, the damage to the yacht resulting from the heavy weather crossing and the stranding amounts to $3,938.08, which amount the plaintiff's subrogated insurance carrier, Atlantic Mutual Insurance Company, is entitled to recover of and from Challenger. The plaintiff, however, contends that in addition to that amount he is entitled to an additional sum of $1,600, representing the cost of the complete refinishing of the vessel. The Court finds that upon arrival at its ultimate berth in Bimini Harbor, the yacht was in "new yacht condition" with the exception of the damages previously noted. The condition of the finish of the vessel was the standard finish used by the manufacturer upon vessels of this type and class. There was no special undertaking to deliver a yacht with any other than standard finish. The condition of protrusion of caulking compound described by the plaintiff and other witnesses is, according to the great weight of the testimony, a normal and customary condition upon yachts of this construction, and the removal of same is no more than a matter of ordinary maintenance. The application of a semigloss or gloss finish to the yacht, following scraping of the extruded putty, constituted a betterment of the vessel. Consequently, the plaintiff is not entitled to the cost of the scraping and refinishing of the entire exterior hull of the vessel.

In addition to the physical damage to the vessel, plaintiff has asserted a claim for loss of use. The plaintiff contends that he had entered into certain charter agreements with a group of six friends whereby each of them was to charter the yacht for a one-week period at a weekly charter hire of $2,000. He testified that these charters were to commence on April 27, 1969, the day following the casualty, and were to run consecutively for a period of six weeks, the exact amount of time that was actually required to repair and refinish the yacht, in accordance with plaintiff's instructions. Plaintiff contends that even if the charters should be held to be illegal and not an element of damage in this case, that they, along with other evidence, establish the reasonable value for the charter of a replacement yacht and should be used to calculate the plaintiff's loss of use of his vessel during the period of repairs.

At the time contemplated by the charters, plaintiff's vessel was licensed by the Bureau of Customs (as a private pleasure yacht pursuant to Title 46 U.S.C. § 103) and was thereby prohibited from transporting or carrying passengers for hire. Thus, the only means whereby the plaintiff's yacht could have been utilized for hire was through a bare boat charter. The charter agreements offered in evidence by the plaintiff were, on their face, not bare boat or demise charters. Each charter party (and they were all identical in terms) reserved to the owner the right to choose and actually employ the Captain; and while other members of the crew were placed under the control of the charterer, control of the Captain was reserved to the plaintiff. The fundamental rule relative to demise charter is stated in Leary v. United States, 81 U.S. (14 Wall.) 607, 20 L.Ed. 756 (1871).

The Supreme Court of the United States stated:

> * * * All the cases agree that the entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage or other service mentioned. The retention by the general owner of such command, possession, and control is incompatible with the existence at the same time of · such special ownership in the charterer.

See also United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894); Gilmore and Black, The Law of Admiralty (1957) 215–219. It is evident, therefore, that the charter parties in question are not bare boat charters, but are instead time charters and cannot constitute proof of loss of use.

The testimony offered by the plaintiff that the charters that were introduced into evidence were valid charters, simply does not ring true. All of the purported charterers were close friends, neighbors or business associates of the plaintiff and all were entered into within a very brief period of time early in April 1969. None of these persons appeared either in person or by deposition in support of the plaintiff's contention as to the validity of these charters. The Court finds that these alleged charters, if they have any evidentiary value at all, are more consistent with an attempt to supply evidence in support of plaintiff's attempt to avoid the payment of the Florida State Sales Tax upon this transaction. The plaintiff. is not entitled to recover upon his alleged claim for loss of charter hire of the yacht. Moreover, most of the period of six weeks was not required to repair the vessel resulting from the fault of Challenger, but to refinish the hull and cabin to suit the taste of plaintiff.

As an alternative to his claim for loss of charter hire, plaintiff contends that he is, in any event, entitled to recover general damages for loss of use of his yacht as a pleasure craft. Earlier cases seem to hold that the owner of a private pleasure yacht is not entitled to recover for loss of use of the vessel when it is detained due to the wrongful act of another party. The Conquerer (1897), 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937. The more modern view, however, seems to be that a private pleasure yacht falls in the same category as any other repairable chattel, such as an automobile, even though no substitute vessel is chartered to take its place during the period of detention. Brooklyn Eastern District Terminal v. United States (1932), 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 and 22 Am.Jur.2d 222. The rule in the State of Florida is in accord with this view. Meakin v. Dreier (Fla.App. 2, 1968), 209 So.2d 252. The Court finds that the damages attributable to the negligence of the defendant as described above could reasonably have been repaired within approximately one week and any further detention or loss of use of the yacht was attributable to delays in the surveying process or in the time consumed in performing maintenance and betterments for which the defendant is not liable and for other reasons beyond the control of the defendant. Therefore, the Court finds that the plaintiff is entitled to recover from the defendant the sum of $2,000 for this element of damage, which sum is entirely adequate to compensate the plaintiff for damages suffered in this respect.

■ Some testimony was offered by the plaintiff concerning an alleged delay in the initial delivery of the vessel for which the plaintiff claimed to be aggrieved. This element of damage is not specifically pleaded in the plaintiff's complaint. Moreover, the Court finds that any delay in the delivery of the vessel to the plaintiff was made necessary by reason of the customizing demanded by the plaintiff and delays on the part of the manufacturer in completing this work. Challenger is not liable to the plaintiff for damages for such delay.

*Counter-Claim*

With leave of Court, Challenger filed a Counter-Claim against the plaintiff seeking to recover the sum of $4,-821.18 representing the 4% Florida State Sales tax upon this transaction and the sum of $50.00 paid to the mate as salary for the two days that he was engaged aboard the plaintiff's yacht. At the time the plaintiff made his final payment on his account to Challenger, plaintiff executed an agreement whereby he would pay the Florida State Sales tax upon the transaction in the event that it be assessed by the Florida Revenue Commission and to assume any and all costs involved including penalty charges, interest and attorney's fees, if required. This statement made under oath, was a material part of the transaction between the parties. Chapter 212.05 of the Florida Statutes, F.S.A. provides for the payment of a tax to the Florida Revenue Commission at the rate of 4% of the sales price of each item or article of tangible personal property when sold at retail in this State and provides that the tax shall be collected from the dealer engaged in the sale. Chapter 212.06 of the Florida Statutes provides in § (3):

> Every "dealer" making sales, whether within or outside the State, of tangible personal property, for the distribution, storage, or use or other consumption in this State, shall at the time of making sales, collect the tax imposed by this Chapter from the purchaser.

The Florida Statutes provide certain exemptions from this sales tax for sales made for foreign delivery. Since the question of whether or not the sale of this vessel constituted a taxable transaction was in doubt, the defendant required the Indemnity Agreement from the plaintiff.

At the time of the trial, the Florida Revenue Commission had not made any demand upon Challenger for the payment of Florida State Sales tax on this transaction. It is, therefore, not necessary for the Court to decide whether or not the transaction contemplated by the parties met the requirements of a foreign delivery so as to obviate the payment of that tax. Since no demand or assessment has been made, the defendant's counter-claim in this regard is premature; therefore, that portion of the counter-claim should be dismissed without prejudice to the parties.