James J. OPPEN et al., Plaintiffs,

Arthur J. Luck and Glenn A. Henry,
Plaintiffs-Appellants,

v.

AETNA INSURANCE CO. et al.,
Defendants,

Union Oil Co. of Calif., et al.,
Defendants-Appellees.

No. 71–1136.

United States Court of Appeals,
Ninth Circuit.

Sept. 20, 1973.

James J. Oppen (argued), Santa Barbara, Cal., for plaintiffs-appellants.

Max K. Jamison (argued), McCutchen, Black, Verleger & Shea, Richard B. Goethals (argued), Schell & Delamer, Girard E. Boudreau, Jr. (argued), Allyn O. Kreps, A. Robert Pisano, Richard H. Zahm, Douglas C. Gregg, George C. Bond, Sam A. Snyder, O'Melveny & Myers, Roger A. Ferree, Robert K. Wrede, Alfred T. Smith, McCutchen, Black, Verleger & Shea, Walter O. Schell, Thomas J. Kelley, Jr., Miles W. Newby, Jr., B. J. Roose, Schell & Delamer, Los Angeles, Cal., for defendants-appellees.

Before HAMLEY and WRIGHT, Circuit Judges, and POWELL, District Judge.[*]

EUGENE A. WRIGHT, Circuit Judge:

In this appeal we must decide whether plaintiffs may recover certain damages caused by the Santa Barbara oil spill disaster of 1969. Preliminary questions are whether general maritime law applies to plaintiffs' claims and, if so, whether the application of maritime law precludes the plaintiffs from recovering under state law. A panel of three special masters[1] took the evidence by stipulation and concluded that the claims involved should be determined by reference to maritime law, that the maritime remedy was exclusive, and that under maritime law plaintiffs' damages were not compensable.

Subsequently, the Supreme Court substantially altered what had theretofore been the standard used by lower federal courts[2] in determining whether a tort was a maritime one, Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) and also broadened the power of the states to apply their own laws to certain maritime torts occurring within their territorial waters, Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). This court asked the parties for additional briefs considering the effect of those decisions. We now conclude that the decision of the special masters was correct and the judgment of the district court entered thereon should be affirmed.

---

[*] Senior District Judge, Eastern District of Washington.

1. The special masters were judges of the Superior Court, Santa Barbara County.

2. *See, e. g.,* Weinstein v. Eastern Airlines, Inc., 316 F.2d 758 (3d Cir. 1963) wherein the court stated:

"The critical factor in determining whether a tort claim comes within the broad statutory grant of admiralty jurisdiction is the situs of the tort; i. e., the place where it happened. If the tort occurred on navigable waters, the claim is one that lies within the jurisdiction of the courts of admiralty; nothing more is required." *Id.* at 761 (footnote omitted). *Weinstein* was expressly overruled in *Executive Jet.* See 409 U.S. at 266, 93 S.Ct. 493.

## I.

On January 28, 1969 large amounts of crude oil escaped from the ocean floor underneath and near Platform "A" maintained by appellee Union Oil Company of California (Union) for the benefit of itself and other oil companies, Platform "A" was on the outer Continental Shelf of the United States in the Santa Barbara Channel. Escaping oil floated to the surface of the ocean and was carried by wind and tide until it virtually permeated the waters of the Santa Barbara Channel and harbor.

Not surprisingly, many lawsuits were brought against the oil companies and their insurers. Certain of these suits brought in the United States District Court for the Central District of California were, by stipulation, consolidated under the caption "Oppen v. Union Oil Co. of California, Civil No. 69–576–ALS."[3]

The parties to the consolidated action agreed to proceed before the special masters with the trial of the claims of seven representative boat owners in order to obtain rulings on certain legal issues prior to trial of the other claims. Before this hearing could be held five of the boat owners' claims were settled.

Trial was held on the claims of the other two owners, appellants Henry and Luck. Each owned a private pleasure boat which had sustained physical damage from contact with the oil slick. The boats had also been rendered unusable in the Santa Barbara Channel for a period of time as a result of the spill. The special masters concluded that federal maritime law was applicable to the plaintiffs' claim and thereunder loss of use of a private pleasure craft was not a compensable item of damage.[4] A judgment was rendered accordingly and the district court granted leave to appeal that we might render an opinion prior to the trial of the remaining claims.

## II.

■ Plaintiffs' initial contention was that California law applied to their claims by virtue of the Outer Continental Shelf Lands Act ("Lands Act"), 43 U.S.C. § 1301 et seq. and Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 363 (1969). In our view plaintiffs read too much into the statute and the decision.

Section 1333(a) of Title 43 provides:
"(1) The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom, to the same extent as if the outer Conti-

---

3. The stipulation further provided:
   "3. In order to provide a basis for the disposition of the above referenced claims it is agreed by the undersigned defendants that they will pay to the above referenced persons and/or plaintiffs who are, or who by reason of subsequent joinder herein become, parties hereto, *all legally compensable damages arising from a legally cognizable injury caused by the aforementioned occurrence* as such damages are determined pursuant to the following provisions; provided, however, that the payment assumed hereby will not exceed such amount and such claim as said defendants or their contractors would be responsible for in a case of negligence."
   It then went on to set out the procedures that would be followed.

"All claims not settled will be tried by a special master, sitting without jury. The right to a jury trial is expressly waived. The master shall decide the questions whether any damages asserted would be recoverable in a case of negligence and the amount of said damages.

\*  \*  \*  \*  \*

"5. Each decision of a special master or the special masters shall be subject to approval by the Court and upon being so approved shall be entered as a separate, independent and final judgment of the Court. The right to appeal is waived in any case where the judgment is less than $10,000.00, unless the Court in its discretion orders otherwise."

4. The plaintiffs were awarded compensation for the physical damage to their vessels.

nental Shelf were an area of exclusive Federal jurisdiction located within a State . . ..

"(2) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State as of August 7, 1953 are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . .."

In *Rodrigue* the Supreme Court was faced with the question of whether the Death on the High Seas Act[5] or the Louisiana wrongful death statute[6] applied to suits resulting from two accidents occurring on fixed platforms on the outer Continental Shelf off the Louisiana coast.

Both accidents had their primary locus on fixed platforms. In one the decedent was performing a test high on a derrick rising above the platform and fell to his death on the floor of the structure. In the other the decedent was working on a crane mounted on the platform and being used to unload a barge. As the crane lifted a load from the barge it collapsed and toppled over onto the barge, killing the worker.

In both cases the Court held that under admiralty principles the Seas Act did not apply. Therefore there was no federal law inconsistent with the Louisiana wrongful death statute and, by virtue of the Lands Act, the latter applied. The Court went on to state categorically

that federal maritime law had no more application to accidents occurring on these fixed structures than it would to accidents occurring on natural islands or on piers extending from the mainland.[7] 395 U.S. at 366, 89 S.Ct. 1835.

It is clear that the Court by its holding in *Rodrigue* did not intend to imply that every occurrence arising out of operations conducted on a fixed platform attached to the outer Continental Shelf would necessarily be governed by state law rather than federal maritime law.

There are well recognized situations where admiralty jurisdiction and maritime law apply to a tort whose locus is on land. For example, the Admiralty Extension Act[8] provides that admiralty jurisdiction applies to any injury *caused* by a vessel on navigable water though the injury may be consummated on land. And in Continental Oil Co. v. London Steam-Ship Owners' Mutual Ins. Ass'n, 417 F.2d 1030 (5th Cir. 1969), the court found that the Louisiana Direct Action Statute[9] was not applicable to a suit arising from the collision of an oceangoing vessel with a fixed drilling platform on the outer Continental Shelf. Although by traditional standards, the "locus" of the tort was on the platform,[10] the court found that the Admiralty Extension Act placed this tort within admiralty jurisdiction and that federal maritime law rather than state law applied.

*See also* Kimble v. Noble Drilling Corp., 416 F.2d 847 (5th Cir. 1969), where the court held that the Jones Act[11] applied to a seaman injured on an offshore drilling rig, stating:

"The Outer Continental Shelf Lands Act does not oust admiralty law having a basis of applicability independent from the location of the platforms at sea; indeed, it specifically provides

---

5. 46 U.S.C. § 761 et seq.

6. La.R.C.C. Art. 2315.

7. Piers extending from the mainland into navigable waters are treated as part of the land. The Plymouth, 3 Wall. 20, 70 U.S. 20, 18 L. Ed. 125 (1865); Hastings v. Mann, 340 F.2d 910 (4th Cir. 1965).

8. 46 U.S.C. § 740.

9. La. Code of Civil Procedure Art. 42.

10. *See* The Plymouth, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125 (1865).

11. 46 U.S.C. § 688.

that the general law of the upland state is made the applicable federal law *only to the extent* that it is 'not inconsistent with * * * other Federal laws.' * * * The case at bar is distinguishable [from *Rodrigue*] in that the Jones Act and the general maritime law do apply of their own force here; they would still apply, in fact, even if we assumed that Kimble received his injuries in the heart of the Louisiana mainland, so long as he was acting at the time as a seaman in the service of his ship." 416 F.2d at 850.

Directly in point is Armstrong v. Chambers & Kennedy, 340 F.Supp. 1220 (S.D.Tex.1972). In that case an explosion and fire on an offshore drilling platform resulted in injury to persons and property on a vessel tied alongside the platform. The court held that maritime law rather than Texas law applied to these claims. *Id.* at 1233.

These decisions indicate that the Outer Continental Shelf Lands Act, as interpreted in *Rodrigue*, does not preclude the application of maritime law to claims with a maritime nexus wholly apart from the location of the platform on the navigable waters.

### III.

■ The locus of a tort is the place where injury takes effect. T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S. Ct. 228, 72 L.Ed. 520 (1928); Bible v. Chevron Oil Co., 308 F.Supp. 312 (E.D. La.1969), aff'd, 460 F.2d 1218 (5th Cir. 1972).

Here, the injuries were the physical damage to plaintiffs' boats incurred while they were on the water and the interference with the plaintiffs' alleged navigational rights in the Santa Barbara Channel. Necessarily these injuries "took effect" in the navigable waters of the United States. *See* Sound Marine & Machine Corp. v. Westchester County, 100 F.2d 360 (2d Cir. 1938); State Dep't of Fish and Game v. S.S. Bournemouth, 307 F.Supp. 922 (C.D.

Cal.1969); *see also* Marine Cooks & Stewards v. Panama Steamship Co., 265 F.2d 780 (9th Cir. 1959), rev'd on other grounds, 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960); Maier v. Publicker Commercial Alcohol Co., 62 F.Supp. 161 (E.D.Pa.1945), aff'd, 154 F.2d 1020 (3d Cir. 1946).

■ Initially, defendants took the position that a finding that the injury took effect on navigable water was dispositive of the choice of law issue in their favor. Had not the *Executive Jet* decision come down since oral argument we would have agreed. *See* Hess v. United States, 259 F.2d 285 (9th Cir. 1958), vacated on other grounds, 361 U. S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); United States v. Matson Navigation Co., 201 F.2d 610 (9th Cir. 1953). But in light of *Executive Jet* a resolution of the choice of law issue based on locality alone is not sufficient. We must also decide whether the wrong bears "a significant relationship to traditional maritime activity." 409 U.S. at 268, 93 S.Ct. at 504.

The plaintiff in *Executive Jet* owned a jet aircraft used for charter hire. In July 1968 it took off from Burke Lakefront Airport in Cleveland on a flight to Portland, Maine. Shortly after takeoff and while over land the aircraft ingested a flock of seagulls into its engines and suffered almost a total loss of power. It descended toward the airport, struck a fence and truck and then settled into the navigable waters of Lake Erie, becoming a total loss. The major part of the damage was done by water.

Plaintiff sued the air traffic controller, the airport operator and its manager for negligence in United States District Court for Northern Ohio on the basis of the admiralty jurisdiction. 28 U.S.C. § 1333(1); *see* Weinstein v. Eastern Airlines, Inc., 316 F.2d 758 (3d Cir. 1963). The district court dismissed the complaint, holding that "the tort in this case did not occur upon navigable waters and the action is not cognizable in admiralty." The Court of Appeals for the Sixth

Circuit affirmed in a 2–1 decision. 448 F.2d 151 (1971).

While the Supreme Court affirmed the judgment of dismissal it did so on altogether different grounds. The Court declined to decide whether the tort "occurred" upon the navigable waters. Rather, as we have noted, it held that more was required than mere maritime locality in order to involve admiralty jurisdiction. It then found that, upon the facts of this case, the additional requirement that the wrong bear a significant relationship to traditional maritime activity had not been met.

*Executive Jet* does not compel a reversal in the present case. Neither the tort there alleged (negligent failure to clear the runway) nor the resulting injury (property damage to the aircraft) bore any relationship to traditional maritime activity. In our case plaintiffs sought damages for physical injury to maritime vessels and for interference with their right of navigation. Such claims do bear a significant relationship to traditional maritime activity. It is precisely plaintiffs' alleged rights to engage in "traditional maritime activity" that they are seeking to protect.

In their supplemental brief plaintiffs contend vigorously that defendants were not engaging in "traditional maritime activity." However, the nature of defendants' activities is not dispositive. *See* Philadelphia, Wilmington & Baltimore Railroad Company v. Philadelphia & Havre De Grace Steam Towboat Co., 23 How. 209, 64 U.S. 209, 16 L.Ed. 433 (1859); Firemen's Fund Ins. Co. v. Standard Oil of California, 339 F.2d 148 (1964); Sound Marine & Machine Corp. v. Westchester County, *supra*; The America, 34 F.Supp. 855 (E.D.N.Y.1940). We hold that plaintiffs' claims for property damage to their vessels and for interference with their right of navigation sound in maritime tort. *Accord*: American Waterways Operators, Inc. v. Askew, 335 F. Supp. 1241 (M.D.Fla.1971), rev'd on other grounds, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973); Salaky v. Atlas Barge No. 3, 208 F.2d 174 (2d Cir. 1953).

IV.

Under federal maritime law loss of use of a private pleasure boat is not a compensable item of damages. The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897).[12] *A fortiori* no cause of action sounding in maritime tort can be maintained when the alleged injury is interference with plaintiffs' use of their boats in the Santa Barbara Channel.

V.

The special masters assumed that their holding that plaintiffs' injury was caused by a "maritime tort" committed by defendant precluded the application of California law to plaintiffs' claim. At the time it was made this assumption was based on good authority,[13] and was consistent with the holding of the court in American Waterways Operators, Inc. v. Askew, 335 F.Supp. 1241 (M.D.Fla. 1971). However, since that time, *Askew* was reversed by the Supreme Court, Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L. Ed.2d 280 (1973).

In *Askew* the three-judge court held that the Florida Oil Spill Prevention and Pollution Control Act[14] was unconstitutional in its entirety. That court rea-

12. Plaintiffs contend that *The Conqueror* has been limited by Brooklyn Eastern District Terminal v. United States, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932). While one court has agreed with this contention (*see* Finkel v. Challenger Marine Corp., 316 F. Supp. 549 (S.D.Fla.1970)), we do not. The cited language in *Brooklyn* (287 U.S. at 175, 53 S.Ct. 103) was dictum. In our view it takes a new and contrary holding of the Supreme Court before we are relieved of our obligation to follow previous holdings of that Court.

13. *See* Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

14. L.Fla.1970 c. 70–244.

soned that the Act, which imposed upon the owners and operators of vessels and terminal facilities unlimited liability without fault for clean-up costs incurred by the state and for other damages suffered by the state or private persons as a result of an oil spill originating from the vessel or terminal facility, conflicted with the Water Quality Improvement Act, 33 U.S.C. § 1161 et seq. and also constituted an unconstitutional attempt by the state of Florida to prescribe rules of decision for matters falling within the admiralty jurisdiction of the United States.

The three-judge court also found that those parts of the Act which did not conflict with the Water Quality Improvement Act, i. e., those dealing in compensation for property damage, were nevertheless unconstitutional because they "would effect—in the words of Jensen—the 'destruction of the very uniformity in respect to maritime matters which the Constitution was designed to establish.'" 335 F.Supp. at 1248. The court reached this conclusion because the Florida Act in imposing liability without fault went far beyond the liability imposed by the general maritime law which was predicated upon negligence or unseaworthiness.

The Supreme Court reversed the judgment of the three-judge court and indicated, first, that it found no conflict between the Water Quality Improvement Act and the Florida Pollution Control Act. Second, the Court noted that actions to recover for property damage on shore caused by pollution emanating from vessels on the water were not within the traditional admiralty jurisdiction, The Plymouth, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125 (1865), but were within the admiralty jurisdiction only by virtue of the Admiralty Extension Act, 46 U.S.C. § 740. The Court concluded that, at least for injuries actionable in admiralty only by reason of the Admiralty Extension Act, such jurisdiction was not in-

tended to be exclusive and Florida could enact rules of decision of its own to apply to these injuries. On this basis the Court reversed the judgment of the district court holding the Florida Act unconstitutional in its entirety.

Askew had an unusual procedural posture. The ship and terminal operators had sued various state officials for declaratory judgment that the Florida Act was unconstitutional and an injunction against its enforcement. Although there had been no oil spill when suit was brought the operators claimed a sufficient adverse interest on the ground that they were immediately subject to various licensing, regulatory and financial responsibility provisions of the act. The three-judge court agreed and, after holding the various remedies afforded public and private interests by the Florida Act were unconstitutional, found further that these licensing and financial responsibility provisions were so interwoven with and dependent upon the substantive provisions that they, too, were invalid. 335 F.Supp. at 1250.

As noted, the Supreme Court held that Florida could provide remedies for persons suffering injury on shore from pollution emanating from ships at sea, so-called "ship-to-shore" pollution. It followed that the licensing and financial responsibility provisions of the Florida-enactment, those parts of the Act really at issue in Askew, were likewise valid ancillary measures. But the Court in Askew was not presented with the issue and did not decide whether other aspects of the Florida law were constitutional. Specifically, the court did not decide whether "ship-to-sea" or "shore-to-sea" pollution were also proper subjects of state concern.

## VI.

In the present case we need not decide whether Askew is authority for applying California law to the present

case of shore-to-ship pollution. Even assuming that the California statutes providing a remedy for nuisance were intended to apply to injuries occurring within the navigable waters,[15] and that, under *Askew*, such application would be constitutional, it would not help the plaintiffs in the present case. There is no right under California law to recover for damage to the navigational rights enjoyed by these plaintiffs.

Plaintiffs argue strenuously that "loss of use" of a private pleasure vehicle or vessel is a compensable item of recovery under California law, citing Valencia v. Shell, 23 Cal.2d 840, 147 P.2d 558 (1944); Johnson v. Central Aviation, 103 Cal.App.2d 102, 229 P.2d 114 (1951); Story v. Gateway Chevrolet, 237 Cal.App.2d 705, 47 Cal.Rptr. 267 (1965), and Malinson v. Black, 83 Cal. App.2d 375, 188 P.2d 788 (1948).

No doubt this is true. But in each of the cases cited the chattel itself was unavailable for use because of physical damage thereto or wrongful detention thereof.

In the present case plaintiffs' claim is not for "loss of use" of their boats; the boats themselves were perfectly usable. Rather, the claim is for loss of "navigation rights" in the Santa Barbara Channel. Thus their claim is, under California law, a claim for damages arising out of a public nuisance. People v. Mack, 19 Cal.App.3d 1040, 97 Cal.Rptr. 448 (1971).

California nuisance law is quite clear. Cal.Civ.Code § 3479 provides:

"Anything which . . . unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park,

square, street, or highway, is a nuisance."

The following sections provide:

"A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal.Civ.Code § 3480.

"*Private nuisance.* Every nuisance not included in the definition of the last section is private." Cal.Civ.Code § 3481.

In the recent case of Venuto v. Owens-Corning Fiberglass Corporation, 22 Cal.App.3d 116, 99 Cal.Rptr. 350, 355 (1971) the law was summarized as follows:

"[A] private nuisance is a civil wrong based on disturbance of rights in land while a public nuisance is not dependent upon a disturbance of rights in land but upon an interference with the rights of the community at large."

Interference with the public's right of navigation in the navigable waters of California is a public nuisance. People v. Mack, *supra*. A civil action for damages arising out of a public nuisance cannot be brought by a private litigant unless he has been specially injured. Cal.Civ.Code § 3493. *See* Yolo County v. City of Sacramento, 36 Cal. 193 (1868). In *Venuto, supra* at 355, the court said:

"Where the nuisance alleged is not also a private nuisance as to a private individual he does not have a cause of action on account of a public nuisance unless he alleges facts showing special injury to himself in person or property of a *character different in kind*

15. While the plain language of Cal.Civ.Code § 3479 seems to compel the conclusion that California did intend to apply its nuisance law to interference with navigation rights on navigable streams and other waters there is some case law authority for narrowly construing such statutes so as to not conflict with the admiralty jurisdiction. *See* Blevens v. Sfetku, 259 Cal.App.2d 527, 66 Cal.Rptr. 486 (1968).

from that suffered by the general public. Under this rule the requirement is that the plaintiff's damage be different in kind, rather than in degree, from that shared by the general public." (citations omitted)

The plaintiffs' physical damages are recoverable in negligence and probably also constitute such special injury as to present them with a cause of action for these damages in nuisance. But the damage suffered on account of their loss of navigation rights in the Santa Barbara Channel and harbor is no different in kind from that suffered by the public generally.[16] As Dean Prosser summarized the law:

"One group of cases has arisen where an established business made commercial use of the public right with which the defendant interfered. Thus when a river is blocked, a steamboat line operating boats upon it, or a company engaged in rafting logs or collecting tolls for passage, has been permitted almost without question to maintain the action. There are several cases in which commercial fisheries making a localized use of public waters have been allowed to recover where the ordinary citizen deprived of his occasional Sunday piscatorial pleasure could not do so." Prosser, "Private Action for Public Nuisance," 52 Va.L.Rev. 997, 1013–1014 (1966). (footnotes omitted)

These plaintiffs were deprived of no more than their "occasional Sunday piscatorial pleasure." For this deprivation there is no recovery either under California law or general maritime law.

The judgment is affirmed.

16. "It is not, however, necessary that the entire community be affected, so long as the nuisance will interfere with those who come in contact with it in the exercise of the public right. The obvious illustration, of course, is the obstruction of a public highway which inconveniences only those who are travelling upon it." Prosser, "Private Action for Public Nuisance," 52 Va.L.Rev. 997, 1001–1002 (1966) (footnote omitted).